**ALASKA INTERSTATE COMPANY,**
Plaintiff,

v.

**John G. McMILLIAN et al., Defendants,**

v.

**O. Charles HONIG, Additional Defend-
ant to Counterclaims.**

**Civ. A. No. 75–188.**

United States District Court,
D. Delaware.

Sept. 3, 1975.

Rodman Ward, Jr., Mason E. Turner, and John H. Small, Prickett, Ward, Burt & Sanders, Wilmington, Del., Stuart L. Shapiro, Skadden, Arps, Slate, Meagher & Flom, New York City, Milbank,

Tweed, Hadley & McCloy, New York City, for plaintiff and O. Charles Honig.

E. Norman Veasey, Charles F. Richards, Jr., and R. Franklin Balotti, Richards, Layton & Finger, Wilmington, Del., Raymond L. Falls, Cahill, Gordon & Reindel, New York City, for defendants Northwest Energy Co. and F. Arnold Daum.

David A. Drexler, Paul P. Welsh, Martin P. Tully, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Leon Silverman, and Milton R. Ackman, Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendants Apco Oil Corp. and Charles P. Siess, Jr.

Hugh Corroon, and Richard E. Poole, Potter, Anderson & Corroon, Wilmington, Del., Robert C. Bledsoe, Cotton, Bledsoe, Tighe, Morrow & Dawson, Midland, Tex., for defendants Stoltz and The Tipperary Corp.

Jack B. Jacobs, and Richard A. Levine, Young, Conaway, Stargatt & Taylor, Wilmington, Del., John C. Snodgrass, Vinson, Elkins, Searls, Connolly & Smith, Houston, Tex., for defendants Gulf Interstate Co. and C. T. Wells.

Arthur G. Connolly, Jr., and John R. Bowman, Connolly, Bove & Lodge, Wilmington, Del., Richard E. Hill, and James V. Dolan, Steptoe & Johnson, Washington, D. C., for defendants McMillian, Himmelman, Insley, Patterson, Perry and diZerega.

## OPINION

STAPLETON, District Judge:

This case arises in the context of competing tender offers by Alaska Interstate Company ("Alaska"), and Northwest Energy Company ("Energy"), which seek control of Apco Oil Corporation ("Apco"). The common stock of each of the three is listed on the New York Stock Exchange. Alaska, in its amended complaint filed on July 15, 1975, alleged a conspiracy among Energy, Apco and others resulting in violations of §§ 9(a), 10(b), 13(e), 14(a), 14(d), 14(e) and 20 of the Securities Exchange Act of 1934,[1] and various rules and regulations promulgated thereunder. The defendants denied the existence of any illegal conspiracy on their part and counterclaimed against Alaska and its Chairman, O. Charles Honig, alleging violations of Sections 7, 10(b), 13(d), 14(d) and 14(e)[2] and certain regulations issued thereunder.

On July 22, 1975, defendants Energy and Apco moved separately for temporary injunctive relief seeking an order that would, *inter alia*, restrain Alaska from "taking down" any Apco shares tendered prior to expiration of Alaska's amended tender offer at 12:01 A.M., July 26, 1975. After these motions had been argued to the Court, the parties stipulated, on July 25, 1975, that both the Energy and Alaska tender offers then outstanding would be extended until a date to be fixed by the Court following a decision on defendants' motions for preliminary injunctive relief. In addition, the parties agreed to allow stockholders to withdraw any tendered shares during the interim. August 18, 1975 was fixed as a hearing date for these motions as well as for a motion of Alaska for preliminary injunctive relief against the outstanding Energy offer.

During the period from the filing of the original complaint on July 10, 1975 until August 18, 1975, extensive discovery was conducted on an expedited basis. Due to the cooperation of counsel and the parties, there has been a virtually complete production of the relevant documents both of the parties to this action and of related third parties, and numerous depositions have been taken around the country. The parties have agreed to submit the preliminary injunction motions on the mammoth record that has

1. 15 U.S.C. §§ 78i, 78j, 78m, 78n and 78t.

2. 15 U.S.C. §§ 78g, 78j, 78m, 78n and 78u. Energy counterclaimed solely for alleged violations of Sections 13(d), 14(d) and 14(e) of the '34 Act. 15 U.S.C. §§ 78m and 78n.

been thus developed. This Opinion is the product of the Court's review of that record and the authorities cited by the parties in the extensive briefing.

Before considering the legal issues raised by the parties, it is necessary to more completely develop the factual background of this case, including the complex corporate interrelationship of the target company, Alaska, and Energy and the terms and chronology of the four competing tender offers.

In 1957, Pacific Northwest Company ("PNW") constructed the first natural gas transmission pipeline that served the Pacific Northwest region. In May of the following year, El Paso Natural Gas Company ("El Paso") acquired virtually all of PNW's outstanding common stock. An anti-trust action was thereafter commenced and in 1964 the Supreme Court ordered El Paso to divest itself of PNW's assets.

Various corporate entities subsequently made bids to purchase the PNW assets. Among those making such an application was The Tipperary Corporation ("Tipperary"). On August 18, 1971, defendant Tipperary entered into a Joint Venture Agreement with Apco and Gulf Interstate Company ("Gulf") whereby the parties agreed to jointly pursue Tipperary's application for control of the PNW assets. On September 20, 1971, a new joint venture agreement[3] ("the Joint Venture Agreement") was signed under which Alaska became a member of the "Apco Group" and agreed jointly to pursue the Tipperary application. On June 16, 1972, the United States District Court for the District of Colorado approved the application of the Apco Group.

On February 7, 1974, the divestiture was accomplished. El Paso had previously caused a new entity called the Northwest Pipeline Corporation ("Pipeline") to be formed and had transferred all of PNW's assets to Pipeline. Pursuant to the Joint Venture Agreement, the Apco Group purchased 20% of Pipeline's common stock which was held in the following amounts by members of the Apco Group: Alaska—7½%; Apco—7½%; Gulf—3%; and Tipperary 2%. The remaining 80% of Pipeline's common stock was then placed, pursuant to a voting trust agreement of February 7, 1974,[4] ("the Voting Trust Agreement"), in a five year irrevocable voting trust. Voting trust participation certificates representing the trusteed Pipeline shares were then issued to El Paso's shareholders and these certificates as well as Pipeline's common stock were subsequently listed on the New York Stock Exchange.[5]

On January 3, 1975, the United States District Court for the District of Colorado approved a reorganization proposed by Pipeline's directors which called for the creation of a holding company which would have Pipeline as a wholly owned subsidiary. In the reorganization Energy became the parent company of Pipeline through a merger in which the holders of Pipeline common stock received a Energy common stock on a share-for-share basis. As a result, the Apco Group now holds 20% of Energy common stock and the voting trustee holds virtually all of the remaining 80% of that stock.[6]

3. Exh. A, Plaintiff's Complaint, Docket # 16.

4. Exh. B, Plaintiff's Amended Complaint, Docket # 16. The parties to the Voting Trust Agreement included the Apco Group, El Paso, Pipeline and John G. McMillian, the Chairman of Energy designated as the voting trustee.

5. In order to facilitate the listing of Pipeline stock on the N.Y.S.E., the Apco Group entered into a Stock Ownership Agreement on March 18, 1974. Falls Aff., Exh. MM, Docket # 57B.

6. A few certificate holders have turned in their certificates for Energy common stock pursuant to a provision of the Voting Trust Agreement which permitted such an exchange by anyone who could demonstrate that he had no substantial connection with El Paso.

By the Spring of 1975 differences had arisen between the parties. On July 7, 1975, Alaska announced a tender offer[7] for up to 1.5 million shares (approximately 51% of Apco's outstanding common stock) at $17.50 per share.[8] By the terms of this offer, Alaska was only committed to purchase tendered Apco shares if at least 900,000 such shares were tendered prior to the expiration of the offer on July 21, 1975. These purchases were to be financed by an "unsecured" $28 million loan from a commercial bank. Alaska disclosed that its intentions in making the offer were to gain control of Apco and thereafter Energy and to effect a merger or other combination between itself and the other two entities.

On July 10, 1975, Energy made a competing tender offer[9] for at least 1.5 million shares of Apco, at $20 per share. The purchases were to be financed by a $30 million loan from a commercial bank secured by all the outstanding common stock of Pipeline and by 51% of the outstanding shares of Apco, assuming the success of the counter-offer. Energy stated that its purpose in seeking control of Apco was to effect a combination of Apco and Energy in a transaction in which Apco stockholders would receive Energy common stock.

On July 14, 1975, Alaska announced an amended tender offer[10] to purchase Apco shares at $23.50 per share. Alaska stated that it sought 1.2 million shares (approximately 41% of Apco's outstanding common stock), but would purchase 1.5 million shares if adequate financing became available. By the terms of this amended offer, no minimum number of shares would be required to be tendered before Alaska became obligated to purchase them. The purchases were to be financed by an "unsecured" $30 million loan and the offer stated that additional loan commitments were being sought which would enable Alaska to purchase at least 51% of the outstanding Apco shares. The offer was to have expired on July 26, 1975 at 12:01 A.M. By July 24, 1975, Alaska had negotiated an additional loan commitment from its bank up to a total of $43.5 million dollars.

On July 22, 1975, Energy amended its prior counter-tender offer, offering to purchase 1.5 million shares of Apco at $25.00 per share.[11] Energy agreed to purchase no less than 1.5 million shares and announced that it planned, if it gained control of Apco, to effectuate a complete liquidation of that company. This offer was financed by a $37.5 million loan from First National City Bank, secured by the outstanding stock of Pipeline, all Apco shares acquired pursuant to the tender offer, and the shares of Northwest Coal Corporation, a wholly-owned subsidiary of Energy. The expiration date of this offer was August 1st.[12]

## I. THE APPLICABLE LEGAL STANDARDS.

The parties are in substantial agreement about the legal standards to be applied in considering the applications now before the Court. First, they agree that in order to be entitled to a

7. Exh. A, Falls Aff., Docket # 53B.

8. The closing price of Apco stock on the N.Y.S.E. on July 3, 1975, the last day prior to announcement of the first tender offer was $13.25.

9. Exh. E, Plaintiff's Amended Complaint, Docket # 16.

10. Exh. D, Falls Affidavit, Docket # 53B.

11. Exh. A, Richards Aff., Docket # 60.

12. The four competing tenders have spawned other litigation. On July 22, 1975 Apco filed suit in the Southern District of New York against Alaska, Chemical Bank and others asking injunctive relief against the Alaska tender primarily on the grounds that its financing had violated Federal Reserve Board Regulation T and U. This suit has recently been transferred to this Court. On July 21, 1975 the voting trustee filed a petition for instructions in the United States District Court for the District of Colorado. It is this Court's understanding that the petition has been dismissed as premature.

preliminary injunction, a movant must show:

> either a combination of probable success on the merits and the possibility of irreparable injury or that plaintiff has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for further litigation and deliberations. Plaintiff must also show that the balance of equities sharply weighs in its favor. *Ronson Corp. v. Liquifin Aktiengesellschaft,* Civ. 785–73 (D.N.J.), aff'd, 483 F.2d 846 (3rd Cir. 1973), cert. denied, 419 U.S. 870 (1974).

See also *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247 (2d Cir. 1973); *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 692 (2d Cir. 1973); *Elco Corp. v. Microdot, Inc.,* 360 F.Supp. 741, 746 (D.Del.1973).

■ Further, the parties agree that the Court must weigh "the balance of the equities" and, in doing so, must consider more than the potential of injury to the movant. As this Court observed in *Elco Corp. v. Microdot, Inc.,* 360 F. Supp. 741, 746 (D.Del.1973):

> Where preliminary injunctive relief is sought the Court must weigh the potential of irreparable harm to the plaintiff absent judicial intervention, the potential of irreparable harm to the opposing party from judicial interference, the potential harm to the public interest and the likelihood of the plaintiff's prevailing on the merits. *Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc.,* 414 F.2d 506 (3rd Cir. 1969); *Winkelman v. New York Stock Exchange,* 445 F.2d 786 (3rd Cir. 1971); *Nelson v. Miller,* 373 F.2d 474 (3rd Cir. 1967).

Finally, the parties agree, in general at least, with the advice offered by Judge Friendly in the following two quotations from *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937 (2nd Cir. 1969):

> Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders. *These considerations bear on the kind of judgment to be applied in testing conduct—of both sides—and also on the issue of materiality.*

*Id.* at 948 (emphasis the court's).

* * * * * *

> . . . [W]e think that in administering § 14(d) and (e), district judges would do well to ponder whether, if a violation has been sufficiently proved on an application for a temporary injunction, the opportunity for doing equity is not considerably better than it will be later on. The court will have a variety of tools usable at that stage. If the filings are defective or the tender offer misleading, the court can [for example] require correction, along, of course, with an opportunity to withdraw . . . . .

*Id.* at 947.

With these principles in mind, I turn to an analysis of the attacks on the Alaska and Energy offers.

## II. THE ATTACK ON THE ALASKA OFFER.

### A. *The Alleged Failure To Adequately Disclose The Purpose of Alaska's Offer.*

■ Energy and Apco charge that Alaska's amended tender materials violate the Williams Act[13] in failing to ad-

13. The Williams Act (Section 14(d), (e) and (f) of the '34 Act) provides, in part, that "(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading,

equately disclose Alaska's plans in the event it secured control of Apco. The Court finds this charge to be without foundation on the current record.

In a section entitled "Purpose Of Offer", Alaska discloses that it seeks "to acquire working control of" Apco. It then states the following concerning its plans for Apco in the event it secures control:

> Although the formulation of specific plans or proposals regarding the Company depends upon the results of this Offer and other factors, including the results of the Energy Offer and a combination of the Company and Energy proposed therein and a review of the Company's business and corporate structure, if the Purchaser acquires control of the Company it presently intends to seek to effect a combination with the Company, sale or exchange of assets of the Company, liquidation of the Company, or acquisition of all or a portion of the remaining Shares through subsequent private or open market purchases or through further tender offers or through exchange offers.
>
> Any acquisition (including the purchase of additional Shares), merger or other combination or similar transaction between the Purchaser and the Company may be on terms different from those of this Offer. Such terms would be set with reference to market and other factors considered relevant by the Purchaser at the time and may include the payment of more or less cash, or other consideration having a greater or lesser value, than the price being offered hereby.
>
> As indicated above, the Purchaser does not have commitments for borrowings significantly greater than those required to purchase 1,200,000 Shares hereunder, and, accordingly, although the Purchaser does not presently have any definitive plan or arrangement, it has to date given primary consideration to the possible issuance of securities in contemplating any combination with the Company.

Alaska's materials thus reveal that it seeks a combination with Apco and that, although no specific plan has been decided upon, "primary consideration" is being given to a combination involving the issuance of securities of Alaska.

In mounting their offensive on this point, Energy and Apco stress that Alaska is committed to purchase only 41% of the tendered Apco stock and that, as a result, Alaska's plans for a combination with Apco are of critical importance to all Apco stockholders, whether or not they ultimately decide to tender. In this context, they argue that Alaska should have disclosed that: (1) its overriding objective from the beginning has been to secure control of Energy, (2) it has formulated specific plans for an Apco-Alaska merger with a one-for-one common stock exchange ratio, a ratio which ascribes a value to Apco shares at a price 35% below the tender price, and (3) it presently intends to effect a major change in the business of Energy if it secures control of that corporation.

As will be discussed hereafter, the tender materials disclose Alaska's interest in securing working control of Energy as well as its interest in securing working control of Apco. The Court considers this disclosure adequate to permit the Apco stockholders to make an informed decision without a recitation of the historical development of Alaska's motivation in making the tender offer.

While the second deficiency asserted by Energy and Apco would be a more serious one if the record supported the allegation regarding the existence of a specific plan for an Alaska-Apco merger, I conclude that the current record does not suggest the existence of such a specific plan.

. . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. . . ." 15 U.S.C. § 78n(e).

Alaska's management, in their affidavits and depositions, deny that any decision has been made with respect to the terms of an Alaska-Apco combination and the documents and depositions reflect no meeting or discussion of the board or top management of Alaska in which such a decision was made. Moreover, since no timetable is reflected in the documents or depositions, and since the exchange ratio could well be effected by market changes in the interim (particularly in light of the competing tender outstanding at the time of Alaska's amended offer), it is reasonable to think that no definite terms have been determined. Energy and Apco assert, however, that Alaska was forced to formulate definite plans for an Alaska-Apco merger in order to secure credit for the proposed tender and that a series of documents which were submitted to the banks and relied upon by them disclose a specific plan.

The documents referred to by the defendants do show financial figures reflecting a merger of Alaska and Apco which would involve an exchange of Alaska common for the remaining 49% of the outstanding Apco common stock. The Court believes defendants read too much into this fact, however. The tender materials did disclose a plan for a combination of the two corporations which would probably involve the issuance of Alaska securities. The relevant question is whether the bank documents evidence the existence of a definite plan for the terms of that combination.

A June 5, 1975 "confidential" report reflecting a meeting of representatives of Alaska, its investment banker, Kuhn, Loeb, and its counsel, Milbank, Tweed, contain figures reflecting an Alaska-Apco merger. The introductory language clearly indicates that the figures reflect *possible* merger terms. Three sets of figures are given assuming different market prices for *Alaska* stock. *Each* assumes a value for *Apco* shares equal to the then contemplated tender price of $15.75 per share, $3.75 over the then market price of Apco shares. Based on assumed Alaska market prices of $15.75, $17.00 and $20.00, respectively, the memo shows exchange ratios of 1:1, 1:.926, and 1:.788.

Under dates of June 12, 1975 and June 26, 1975, Alaska submitted "highly confidential" reports to the Chemical Bank and Bankers Trust Company, respectively. These reports were updated by a revised report of July 4, 1975, three days before the tender. These report financial data and projections for Alaska alone, Apco alone, Energy alone, a combination of Alaska-Apco, and a combination of the three corporations. The figures reflecting a combination of Alaska and Apco are based on the following assumption:

> Cash tender of $15.75 per share for 51% of [Apco] . . . followed by merger of the remaining 49% on a one-for-one common share exchange.

It is important to note three things about these bank documents: (1) the revised report of July 4, 1975, in setting forth its "assumptions and procedures", expressly labels the 1:1 exchange ratio as "hypothetical only", (2) the figures reflecting an ultimate combination of the three companies are calculated on the basis of assumptions of stated specific terms for the Energy acquisition as well as the Apco one, and (3) the hypothetical Alaska-Apco combination is based on assigning a value to the remaining Apco shares equal to the *then contemplated* tender offer price. The documents themselves, accordingly, evidence the hypothetical character of the terms assumed. In addition to the label placed on the exchange ratios, it is clearly unreasonable to suppose that, with all the water that would have to go over the dam prior to an Energy acquisition, management had decided upon specific terms for that transaction. Moreover, in light of the fact that the assumed value for Apco shares in an Apco-Alaska

merger was pegged to the then current tender price, the bank documents clearly do not support the argument that Alaska, at the time of its amended offer, intended a merger in which Apco stockholders would receive 35% less than the tender price of the second Alaska offer.

In this Court's judgment, the bank documents *do* reflect a plan on the part of Alaska to acquire Apco and Energy. They are entirely consistent, however, with the explanation given in the McCall affidavit and deposition that the figures submitted to the bank were for illustrative purposes only and do not demonstrate the existence of a management decision on the terms of either transaction.

In every tender offer looking forward to a combination of the offeror and the target, the offeror conducts analyses to determine the feasibility of the tender plan. While every case must be judged on its own facts, when no specific terms for the combination have been decided upon, reference to *possible* terms, even if so labeled, will not ordinarily provide a basis for informed stockholder judgment and will hold some potential for miscommunication.

In support of its third argument concerning Alaska's statement of its purpose, Energy relies upon deposition testimony of Alaska's chief executive officer of which the following excerpts are typical:

> Q And the first sentence says:
>
> > I am concerned that the management policies that the joint venture group intended Energy follow—policies I testified to in Denver and which were a basis for the award of El Paso Pipeline assets to the joint venture group—have been and are being subverted by Energy's present management.
>
> Could you tell me Mr. Honig, in what respects you thought that the policies to which you referred there were being, had been and were being subverted?
>
> * * * * * *
>
> A One of the policy positions we took in the Denver court and were interrogated on at some length, as I recall, was that if we, the Apco group, if we were the successful applicant, . . . we would advocate and follow a policy of not diversifying Northwest Pipeline.
>
> This was asked because my company as well as some of the others were diversified in varying degrees and the interveners, some of the interveners in that proceeding were interested in what our policy would be to not diversify Northwest Pipeline, to not—I have forgotten the term we used in the testimony, but to not dissipate the management of Northwest Pipeline by having it diversify into other areas of activity.
>
> It is my opinion that policy has not been followed. . . .
>
> * * * * * *
>
> Q Are there other activities of Northwest Pipeline and Northwest Energy that were undertaken prior to the tender offers that you would regard as having been contrary to the policy against diversification that you mentioned?
>
> A Well, I think any activity that is not directly involved with procuring additional natural gas for the market areas to be served is not directly related to restoring competition or helping to restore competition to California is a diversification that we said we would not do because it takes money and management time.
>
> So all of the other activities that are not directly related to Northwest Pipeline's serving the Northwest with natural gas would fall in that category.
>
> * * * * * *

Q And the question is: If Alaska Interstate regains its influence in Energy, is it your intention, as chief executive officer of that company—

A Which company?

Q Alaska Interstate—to attempt to cause Northwest Energy, insofar as you are able to do so, to adhere to the policies that you have just described as being appropriate policies?

A Yes.

■ The Honig deposition does reflect a difference between Mr. Honig and Energy's present management about whether or not Energy should follow a course of diversification. This does not mean, however, that there is a material deficiency in Alaska's statement of its purpose. First, the following disclosure is made in that statement:

> If the Purchaser acquires such control, it will consider and presently intends to seek, at an appropriate time, a combination of the Purchaser, the Company and Energy or a combination of any two of such companies, although there is no assurance that any such combinations will be achieved. In any such event, it is the Purchaser's intent that Energy would continue as a separate entity devoted solely to supplying energy to Energy's market area. . . .

Moreover, the only thing which gives the Apco stockholders any interest in Alaska's plans for Energy is the possibility of a combination of Alaska and Apco or a combination of the three corporations. But, in either of these events, a present Apco stockholder would wind up as a stockholder in a diversified enterprise and not as a stockholder in a "separate entity devoted solely to supplying energy to Energy's market area."

B. *Alaska's Alleged Misrepresentation With Respect To Debt Service On The Loan Secured To Finance The Tender.*

Alaska's tender materials reveal that "the [funds] . . . required by the Purchaser to purchase the Shares under this Offer . . . will be borrowed by the Purchaser from a commercial bank under a loan agreement." The materials then go on to describe the terms of the loan. In the course of this discussion, Alaska states:

> The purchaser anticipates that the cash generated from its operations for the term of the Loan Agreement will be sufficient to service the loan.

Energy and Apco charge that this statement is misleading. The Court concludes, however, that they have shown no probability of success in connection with this contention.

In the Spring of 1974, Mr. Ross, then Assistant Vice President of Economics,[14] in consultation with others members of Alaska's top management, developed earnings and cash flow projections for Alaska for the period 1974 through 1979. These projections were utilized by Alaska's management in its planning process and, on May 6, 1974, were submitted to Alaska's banks in connection with a refinancing of Alaska's bank debt. Given Alaska's need in the Spring of 1974 to reestablish credibility with its banks, I find it reasonable to credit Mr. Ross' statement that:

> . . . Considerable caution was exercised by the Company's management in satisfying ourselves that we had built in enough conservatism in the aggregate to responsibly represent to our banks that the results were achievable, even when certain individual component inputs in the forecast

14. B.A. Yale University 1962, M.B.A. Harvard Business School 1970; employment experience with Alaska from 1970 involving financial analysis.

for then unforeseen reasons might prove to be erroneous.

From the Spring of 1974 through the first six months of 1975, Alaska's actual earnings have exceeded the Ross earnings projections in each period. The forecasts and actual results for the full year 1974 and for the first six months of 1975 are as follows:

| | May 6, 1974 Forecast | Actual Results | Better (Worse) than Forecast |
|---|---|---|---|
| Full Year 1974 Net Income | $3,577,000 | $3,705,000 | $128,000 |
| First Half 1975 Net Income | 3,142,000 | 3,234,000 | 92,000 |

John Kelsey, an Executive Vice President and Director of Blyth, Eastman, Dillon & Co., Incorporated, has analyzed the Ross projections and financial information of Alaska relevant to their evaluation. His firm has had no significant prior relationship with any party to this controversy. He has concluded:

> It is my understanding that the assumptions upon which the 1975 profit plan and the 1975–1980 cash flow projections are based were made in the spring of 1974. It is my opinion that these assumptions are reasonable and, in certain instances, conservative.
>
> Alaska has shown considerable financial improvement since December 31, 1973. It exceeded its earnings projection for 1974 and it has exceeded its 1975 profit plan for the first six months of 1975 by earning $3,234,000, 132% of the $2,459,000 which was budgeted for the six month period. As is typical of a company which is engaged in a variety of businesses, certain subsidiaries were over budget for these periods and others were under budget. The overall results, however, were significantly in excess of Alaska's forecast for the period.
>
> . . . Thus, according to its projections, Alaska would generate available cash flow during the 1975 to 1980 period in an amount which, in the aggregate, would be in excess of the debt service required on the $37 million loan during such period. I believe that Alaska could reasonably expect to generate internally the net cash flow necessary to repay the bank loan over its term.

Members of the Kuhn, Loeb firm are on record with similar opinions and vouch for the acceptability of Ross' methodology in approaching his task.

The 1974 Ross projections provided the basis for the 1975–1980 cash flow and earnings projections presented to the banks in connection with the refinancing of Alaska's bank debt in the Spring of 1975 and in connection with the tender offer loan. The Chemical Bank people considered the forecasts to be within the realm of reason and the memorandum from those who examined the figures to the credit committee recited that "we have received company supplied projections which indicate more than adequate cash flows to pay the additional debt. Please see attached analysis for further details." [15]

15. The Court cannot accept the contention of Apco and Energy that all of the projections submitted to the bank in connection with Alaska's tender offer loan indicated an in-

This is not to say that the entire record supports the view that Alaska will be able to service the tender offer debt from its own operations. Mr. Walter Lubanko of F. Eberstadt & Co., Apco's dealer-manager and financial advisor in connection with its tender offer, for example, finds Ross' cash flow projections, and the earnings projections upon which they are based, to be unrealistic and unreliable. Both he and a statistician from Arthur Little have challenged the methods utilized by Ross. Moreover, the record shows that Bankers' Trust discounted Alaska's cash flow projection in the course of the analysis conducted by it before increasing its participation in Alaska's bank debt.

In sum, however, I believe that the current record establishes only that Alaska's ability to service the tender loan is a subject on which reasonable men skilled in the field have differed. It does not suggest to me that there was no rational basis for the statement made in Alaska's tender or that Alaska acted in bad faith in making that statement. Accordingly, I believe the relevant questions are: (1) whether one who makes a tender offer may make a good faith statement that it anticipates sufficient cash flow from its own operations under circumstances in which different analysts might reach different conclusions, and (2) if he may, may he do so without including the analysis which supports management's opinion? I conclude that the first of these questions must be answered in the affirmative. Cash flow projection for a five year period is far from an exact science and it is to be expected that there will frequently be room for debate about such projections. Yet, whether or not management anticipates servicing the tender debt from its own operations is something that may be of significant interest to the target company's stockholders. For this reason, I conclude that the offeror should not be precluded from making a good faith statement of its opinion on this subject merely because reasonable men could differ on the validity of management's cash flow projections and the underlying assumptions. At the same time, I cannot accept the defendants' contention that Alaska's cash flow projections should have been provided for analysis by Apco stockholders. The record in this case amply demonstrates that it is not practicable, at least in a case of this kind, to provide sufficient information in the course of a tender statement to allow a stockholder to intelligently assess the validity of such projections.

C. *Alaska's Failure To Include Financial Information About Itself.*

Alaska's tender materials include a section entitled "Certain Information With Respect To The Purchaser." This section contains a general description of Alaska's business operations, sets forth the name and business address and principal occupation of each of the officers and directors of Alaska and discloses certain information about the ownership of, and transactions in, Apco stock by officers and directors of Alaska. In addition, this section discloses that Alaska is subject to filing requirements under the Securities Act "and in accordance therewith files reports and other information with the Commission relating to its business, its financial position and results of operations and other matters." The tender materials then go on to state:

> . . . Such reports, proxy statements and other information may be

tention on the part of Alaska to service the loans from cash generated by Apco and Energy's operations as well as its own. The confidential reports referred to above gave segregated cash flow and profit projection figures for Alaska alone. Projections were also provided for Apco and Energy, but this fact is entirely consistent with the disclosed intention of Alaska to seek combination with Apco and/or Energy.

inspected at the Commission's office in Room 6101, 1100 L Street, N.W., Washington, D.C. 20549, and copies thereof may be obtained upon payment of the Commission's customary charges by writing to that office. Such material may also be inspected at the library of the NYSE, 20 Broad Street, New York, New York 10005, and at the library of the Pacific Stock Exchange, Inc., 301 Pine Street, San Francisco, California 94104.

Energy and Apco do not contest the accuracy of these statements; nor do they dispute that Alaska's financial history for 1974 and prior years is readily available through Standard & Poor's and other standard reference materials.

While Apco and Energy do not contend that anything expressly stated in the section about Alaska was affirmatively misleading,[16] they nevertheless maintain that the disclosures therein are insufficient. Their position is that where (1) a tender is made for less than all of the outstanding stock of the target corporation, (2) the offeror proposes an acquisition of the target corporation for securities of the offeror, and (3) the offeror is in a precarious financial condition, a general statement of the offeror's business is misleading in the absence of some more specific information about the offeror's financial condition.

With regard to the factual allegation that Alaska's financial position is precarious, the record does establish that Alaska suffered losses in 1973 and has twice refinanced its bank debt since that time. It also establishes, however, that the refinancing in the Spring of 1975 was to take advantage of decreased interest rates and eased restrictions that the banks participating in that refinancing were willing to grant as a result of improved operating results. Even more significant, I believe, is the judgment of the market place. Energy's Lubanko affidavit supplied the following information on price/earnings ratios:

| | P/E |
|---|---|
| El Paso | 6.7x |
| Mississippi River | 4.3 |
| No. Natural Gas | 5.4 |
| Panhandle | 6.6 |
| So. Natural Resources | 8.7 |
| Texas Gas Transmission | 6.9 |
| Tenneco | 6.5 |
| NWPC | 4.3 |
| *Alaska* | *9.7* |

(Emphasis supplied)

At its pre-tender price of 13¼, the Apco price/earnings ratio was 6 (Wall Street Journal, July 7, 1975).

This is not to say that segments of Alaska's operations do not have problems or that advisability of Alaska as an investment cannot be debated. The record does not, however, suggest to the Court that Alaska is generally in a precarious financial situation or that it has a specific problem of particular significance to the Apco stockholders in determining their response to the competing tenders.

Accordingly, this is not a situation where the general statement of the offeror's business operations is misleading because it impliedly represents, contrary to the fact, that the offeror is a viable business organization and is not beset

16. Energy and Apco do maintain that Alaska's statement in the financing section about service of the tender offer constitutes an affirmative and misleading representation about Alaska's financial health which required further disclosure. I have previously held, however, that this statement of opinion was not a misrepresentation and did not require disclosure of cash flow projections. Since, as Alaska points out, financials would not enable Apco stockholders to evaluate management's opinion on this subject, I do not believe a duty to disclose financials should be held to arise from the inclusion of the debt service statement.

by any problem which casts in doubt its ability to consummate its offer. Accordingly, so far as the present record discloses, Apco and Energy have no substantial prospect of success on this issue unless it can be said that the Williams Act is violated whenever one who tenders for less than all of the stock and proposes an acquisition of the target corporation for its own securities fails to provide its financials in the tender materials. Accordingly, I turn to that question of law.

The Williams Act requires that a tenderor provide such information as the Commission shall require by regulation and, in addition, that it refrain from making any untrue statement of a material fact as well as refrain from omitting to state any material fact necessary in order to make the statements made not misleading. In a cash tender offer situation, as opposed to an exchange offer, the Commission has not required the inclusion of financials even though it has frequently been pointed out that such financials would be of some interest in making decisions with respect to the tender. An ability to make an evaluation of the general health of the tenderor and the quality of its management may well be of interest to the stockholder in a cash tender in deciding whether and to what extent he may be willing to cast his lot with the offeror's plans for the future.

On the other hand, where the offeror is making an offer to exchange its own securities for those of the target company, the SEC requires disclosure of financials because the stockholders have a specific and paramount interest in evaluating the consideration to be received if they tender.

Arguably, the instant case is like an exchange situation because the tender offeror is saying, "tender and take cash or cash and securities in the event of proration, or don't tender and take securities." The present situation is materially different, however, from the exchange offer one. No definite exchange ratio for the possible combination of Apco and Alaska has been decided upon and it is impossible for the Apco stockholders to evaluate the consideration they may receive for any shares not tendered or not purchased because of proration. As in other cash tender offer situations, the interest of Apco stockholders in the financials of Alaska is necessarily limited to an interest in being able to evaluate the general health of Alaska and the quality of its management.[17]

Given (1) the judgment of the Commission and the apparent rationale for its distinction between cash and exchange offers, (2) the fact that financial information about Alaska sufficient for the purpose of general evaluation is readily available to Apco stockholders, (3) the fact that nothing has been shown about Alaska's recent history which would make the publicly available financials materially misleading, and (4) the fact that no affirmative representations were made with respect to Alaska's financial history or prospects (other than an opinion with respect to debt service), I find no legal basis for implying a duty to include financials in Alaska's tender materials. I have found no case which suggests that a contrary conclusion should be reached on the facts of this case. *Interstate Brands Corporation v. D. P. F. Incorporated,* No. 85 CV417W (W.D.Mo. June 23, 1975) lends some support to the result I here reach.

In passing, I also note the fact that Energy, in its $20 offer for less than all of the Apco stock, stated that it contemplated a combination with Apco in which Apco stockholders would receive common stock of Energy. Its tender materials contained a similar general description of Energy's business, but contained no financial statements. Moreover, Apco counterclaimed in this suit for an injunction against the Alaska tender but,

17. See discussion in *Corenco Corporation v. Shciavone & Sons, Inc.,* 488 F.2d 207 (2d Cir. 1973).

while noting the existence of Energy's $20 offer, did not seek to challenge it on the ground that financial information was not disclosed. The Court believes these facts reflect the general understanding in the securities industry regarding the position of the Commission in situations of this kind.

D. *The Alleged Failure To Reveal Substantial Obstacles To Alaska's Acquisition Of Control Of Energy.*

Apco and Energy maintain that there are three impediments to Alaska's avowed intention to secure control of Energy which were either not disclosed or inadequately disclosed in Alaska's tender materials. I discuss each in turn.

1. *The New York Stock Exchange Agreement.*

On February 18, 1975, Alaska, Apco, Gulf Interstate, and Tipperary Corporation executed a "Stock Ownership Agreement" in connection with their attempt to secure listing on the New York Stock Exchange for the Energy shares and the participation certifications of Energy.[18] The Agreement provided in part:

> No party to this agreement will individually acquire in excess of 30% of the common stock of Energy.

Apco and Energy maintain that Alaska failed to disclose that its plans with respect to Energy would violate this agreement. The Court does not agree.

An acquisition of Apco by Alaska would result in Alaska holding only 15% of the common stock of Energy. As far as Alaska's plans thereafter are concerned, the tender materials reveal that Alaska hopes to secure working control of Energy by virtue of this 15% and that it anticipates a possible combination of Alaska and Energy through "merger or consolidation." Since 80% of the common stock of Energy is held by the voting trustee, Alaska has no reasonable expectation of obtaining more than 20% of the common stock of Energy at any time in the near future. As far as a possible merger or consolidation of Energy and Alaska are concerned, the New York Stock Exchange agreement would not be violated literally and the purpose of that agreement would not suggest that it was intended in spirit to foreclose such a combination.

2. *The Joint Venture Agreement Restrictions On Combinations With Energy.*

Section D of the Joint Venture Agreement provides that:

> In view of the intent of the parties that New Company [Energy] [19] shall operate as a separate entity, no party to this Agreement shall acquire the stock or assets of New Company by merger, reorganization, consolidation, exchange or otherwise (or merge, reorganize, consolidate into or sell its assets to New Company) without the written consent of the parties to this Agreement holding at least two-thirds of all stock in New Company then owned by the parties to this Agreement.

Apco and Energy assert that if Alaska is permitted to consummate its tender and its proposed acquisitions, Alaska will violate its duty under this provision because of the underlying intent to keep Energy as a separate entity. The Court finds this argument unpersuasive.

Sections C and D of the joint venture agreement clearly contemplate that a joint venturer may acquire the stock of other joint venturers and may acquire Energy with the approval of two-thirds in interest of the joint venturers. Alaska's tender materials expressly disclose that the acquisition of Energy by Alaska would require the approval of two-

18. Exhibit OO, Docket No. 53B.

19. This argument of Alaska assumes that "New Company" at this point in time refers to Energy. As discussed below, there is some debate about this proposition.

thirds in interest of the joint venturers, i. e. Alaska and Apco. Moreover, contrary to the contention of Energy and Apco, I find that the joint venture agreement clearly contemplates that Alaska can exercise its vote under this provision of the joint venture agreement in accordance with what it perceives to be Alaska's own interest without violating any fiduciary obligation to the other joint venturers. I say this because the agreement clearly contemplates that there may be a transaction involving the acquisition of Energy's stock or assets despite minority dissent.

3. *The Voting Trust And Joint Venture Agreement As They Relate To Control Of Energy.*

Finally, Energy contends that Alaska failed to adequately disclose the impediments posed by the voting trust and joint venture agreements to its achieving the goal of working control of Energy. This is said to be a material omission since this goal was disclosed in Alaska's tender materials and might well influence a stockholder to tender or not tender, depending upon his view of the merits of this proposal, or, if he approves it, to encourage him either to tender some of his stock to Alaska or accept the risk of proration with Alaska rather than with Energy.

An understanding of Energy's argument requires some additional background. In the Spring of this year, Robert Baldwin, a director of Energy, announced his intention to resign. Alaska took the position that he had been on the board as its designee pursuant to Section A(4) of the original Joint Venture Agreement which provided that "the parties' respective interests shall be entitled to representation on the Board of Directors of the New Company in the same relative proportions as their stock ownership is to that of the other parties hereto." Accordingly, Alaska proposed a replacement to fill the vacancy created by Mr. Baldwin's resignation.

This action spawned a number of requests to counsel regarding the effect of the Joint Venture Agreement. Energy received two opinions of Cahill, Gordon & Reindel, its counsel. The first, dated April 24, 1975, expressed the view that the directors of Energy had a duty to exercise their own best judgment and could not be compelled to elect the proposed nominee. The second opinion expressed the additional view, based on a detailed review of the original agreement and the subsequent amendment thereto, that Section A(4) had been intended to apply only until the successful applicant had been chosen by the Colorado Court and had been superseded by the provisions of the first amendment in which the parties agreed upon a stated list of individuals who would constitute the Pipeline Board following acquisition of the PNW assets. Mr. Honig has acknowledged that he received copies of these opinions prior to the issuance of the tender offer materials here under attack.

Apco secured an opinion, dated May 14, 1975, from Fullbright & Jaworski which expressed a different view of the effect of the joint venture agreement. It conceded that there was support in that document for the view that Section A(4) had been superseded, but stated the opinion that it had not, and that the designees of the Apco Group on the Energy Board had an implied obligation to vote in "such a manner as to effect the intent of the agreement regarding relative representation on the board." The opinion noted, however, that "with Mr. Baldwin's resignation, it would appear that there . . . [were] five 'representatives' of the Apco Group on the board [e. g. Alaska 1, Apco 2, Gulf 1 and Tipperary 1] and six members of the board who were not 'representatives' of the Apco group." The opinion, therefore, concluded that the Apco Group representatives could not carry the day on filling the vacancy or in directing the vote of the voting trustee at the next election of directors. While the record

is not clear about just who on the Energy Board are designees of the Apco Group, it is clear from contemporary documents that the members of the Apco Group contemplated from the outset that there would be outside representation on the Board.

Neither Alaska's initial designee for the vacancy nor two other subsequently suggested alternative designees were elected by the Energy Board to fill the vacancy. Indeed, Mr. Honig could not get a second for any of his nominations at the July 8, 1975 meeting.

These opinion letters reflect the fact, also evident to the Court from a review of the relevant documents, that Alaska's amended tender materials were issued at a time when there was a substantial dispute on several questions: (1) Was the proportional representation clause of the original agreement still in effect? and (2) Even if it was, would it nevertheless not enable a member of the Apco Group holding a majority of the Apco Group's stock to elect a majority of Energy's Board (a) because the discretion of the present board could not be legally bound, (b) because the present directors, even if bound, were bound only to maintain proportional representation vis-a-vis the other members of the Apco Group, or (c) because less than a majority of the board had an obligation under the Joint Venture Agreement?

Alaska has vigorously asserted that these are frivolous questions conjured up by counsel for interested parties and that the Colorado Court which approved the original arrangement intended control of Energy by the Apco Group and did not intend control by a self-perpetuating board. Energy, on the other hand, points with equal fervor to, among other things, the fact that the Voting Trust Agreement did not call for the trustee to vote at the direction of the members of the Apco Group, as it might have done, but rather at the direction of the Energy board, which, it is said, has a fiduciary duty to all holders of Energy stock and Energy voting trust certificates.

It is neither necessary nor appropriate for me in the present context to resolve this dispute between the parties. The critical facts for present purposes are that at the time of Alaska's tender (1) the ability of the holder of a majority of the Apco Group's stock to secure working control of Energy turned on substantial and litigable questions,[20] and (2) at least a majority of Energy's

20. I do not, of course, deny that a self-perpetuating board is an unusual phenomenon and that the Colorado Court may not have intended such a result. There are a number of possible reasons, however, why the court might have chosen to cause the voting trustee to vote at the direction of the board and not at the direction of the Apco Group. The voting trust agreement, for example, provides that voting trust certificate holders who could demonstrate that they had no significant connection with El Paso could exchange their voting trust certificates for stocks during the life of the voting trust. It was thus possible that during the life of the trust, there might be voting stockholders of Energy other than the Apco Group and the voting trustee. Indeed, the voting trust agreement foresaw the possibility that other interests might challenge the Apco Group for control. Article 6 of the Agreement, which is dated February 7, 1974, provides in part:

> In order to protect the integrity of the Decree regarding control of Northwest by the APCO Group for a reasonable period, if at any time within two years from the date of this Agreement any person or persons shall have filed a Schedule 13D under Section 14(d) of the Securities Exchange Act of 1934 (or any similar or successor statute) in respect of the acquisition or intention to acquire the Northwest Common Stock or Participation Certificates, the Voting Trustee is empowered to close its transfer books, to refuse thereafter to convert the Participation Certificates, and shall thereupon . . . petition the Court for instructions with regard to such matter. The conversion rights of the holders of Participation Certificates to convert such Certificates is specifically restricted by the above power of the Voting Trustee.

The Colorado Court may have relied on the initial position of the Apco Group on Energy's board to protect its control during the early part of the voting trust, without intending to tie the votes of the trustee irrevocably to the Apco Group during the life of the trust.

present board, in the Baldwin matter,[21] had acted in a manner which indicated that they would not voluntarily accede to Alaska control of Energy in the event it acquired Apco's Energy stock.

I agree with Energy's position that these were material facts. At the time of the Alaska offer, it appeared that substantial litigation stood between it and its stated goal of control of Energy and that there could be no assurance that that litigation would be successful. I, accordingly, turn to the Alaska materials to determine the adequacy of their disclosure in this area.

The Alaska tender revealed the existence of the Voting Trust Agreement and the identity and holdings of the present Energy stockholders. It then stated:

> The 20% of Energy's stock owned by the members of the Group is subject to a joint venture agreement which provides, among other things, for representation of the members of the Group on the board of Energy in proportion to their holdings in Energy, although the board is presently not so constituted. Mr. O. Charles Honig, the Chairman of the Board, President and Chief Executive Officer of the Purchaser, [Alaska], is a director and Chairman of the Executive Committee of Energy, and three persons who were or are directors of the Company [Apco] are directors of Energy, and a fourth director of the Company, its Chairman, is a special consultant to the board of directors of Energy. The voting trust agreement provides that the voting trustee thereunder will vote the stock of Energy only as directed by the board of directors of Energy.
>
> *    *    *    *    *    *
>
> . . . In making this Offer, the Purchaser is also seeking to acquire control of the Company's interest in Energy which acquisition would be consistent with the provisions of the joint venture agreement. . . . Although it is not certain because of apparent inconsistencies between the joint venture agreement and the voting trust agreement, the total of 15% of Energy stock that would be directly and indirectly controlled by the Purchaser should, through the vehicle of the voting trust, provide the Purchaser with effective control of Energy as well, since control of 15% of the stock of Energy should enable the Purchaser to elect at least a majority of the board of Energy.

It is fair to say that Alaska's tender materials convey the impression that, while not a certainty, acquisition of Apco's Energy shares should, through the vehicle of the voting trust, enable Alaska to obtain effective control of Energy. While it is also revealed that there were currently differences between Energy's Board and Mr. Honig and that Energy was itself tendering for Apco's stock and resulting control of Apco's Energy stock, nowhere is it disclosed in Alaska's tender that *Energy's present board, whose directors the voting trustee was directed to follow by the Voting Trust Agreement,* did not share Alaska's view that control of Apco's Energy shares "should, through the vehicle of the voting trust, provide . . . [Alaska] with effective control of Energy as well."

Energy is substantially larger than either Alaska or Apco both in terms of assets and earnings. In view of Alaska's stated goal of acquiring control of Energy, the potential for achieving this goal would be a significant consideration to an Apco stockholder in deciding how to react to the competing offers. Accordingly, the position of the Energy Board and the probability of litigation before control of Energy could

21. The record also reflects that all directors of Energy, except Mr. Honig, had stated, in response to a prelitigation questionnaire circulated by the corporation, that they were not serving on the board pursuant to any agreement between themselves and another party.

be secured was something to which "a reasonable man would attach importance [to them] in determining his choice of action in the transaction in question." *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 408 (3rd Cir. 1974); *Mayer v. Development Corporation of America*, 396 F.Supp. 917 (D.Del.1975). Alaska's tender was materially deficient in these respects.[22]

E. *The Alleged Inadequate Disclosure Concerning The Buy-Sell Agreement.*

Alaska's tender materials make the following disclosure with respect to a buy and sell provision of the Joint Venture Agreement:

> The joint venture agreement also provides that either of the Purchaser [Alaska] or the Company [Apco] may notify the other of a price for its Energy stock and that upon the giving of such notice the recipient thereof has 90 days in which to elect to sell to the other the Energy stock which it holds or to buy from the other that person's Energy stock, in either case at the price specified in the notice. Neither the Purchaser nor the Company, therefore, may be assured that it may acquire the other's stock interest in Energy if it were to initiate this procedure. In making this Offer, the Purchaser is also seeking to acquire control of the Company's interest in Energy which acquisition would be consistent with the provisions of the joint venture agreement. Control of the Company would permit the Purchaser to control the operation of the foregoing buy-sell agreement. . . .

Energy and Apco do not maintain that this disclosure misdescribes the rights of the parties under the Joint Venture Agreement. Rather, they maintain that it is inadequate because it does not specifically reveal that Alaska's control of Apco would permit the exercise of rights under the buy-sell agreement so as to benefit Alaska at the expense of Apco.

It seems to the Court, however, that the risk to Apco inherent in this buy-sell agreement, in the event Alaska acquires control of Apco, is adequately revealed.[23]

F. *The Failure of Disclosure With Respect to Regulation T.*

Apco and Energy urge in support of their respective motions that the Alaska tender offer is materially misleading in that it fails to disclose that the tender offer financing had been arranged in violation of Regulation T, 12 C.F.R. § 220. Since this argument is predicated upon the actual existence of a violation of Regulation T, it is appropriate to determine whether the record suggests that such a violation has occurred.

Apco and Energy maintain that Alaska's investment advisor, Kuhn, Loeb & Co. ("Kuhn, Loeb"),[24] arranged the tender offer financing in contravention of the regulation's prohibition of such conduct by a broker-dealer. Section

22. To be material a statement in a tender offer need not necessarily relate to a past or existing condition or event. It may refer to a prospective event, even though the event may not occur, provided there appears to be a reasonable likelihood of its future occurrence. *Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Company, Inc.*, [476 F.2d at 696], *Gerstle v. Gamble-Skogmo Inc.*, 478 F.2d 1281, 1298 (2d Cir. 1973). A reasonable stockholder, once informed of the contingency, can then determine whether to assume the risk of its occurrence or non-occurrence in accepting or rejecting the tender offer. Where the event, if it should occur, could influence the stockholder's decision to tender, the chance that it might well occur is a factor that should be disclosed to the investor for consideration in making his or her decision. *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 251 (2nd Cir. 1973).

23. There is no indication in the record that Alaska has decided to exercise its rights under the buy-sell agreement or has developed any plan for doing so.

24. Kuhn, Loeb is also the dealer-manager of Alaska's tender offer.

7(c) [25] of the Securities Exchange Act of 1934 makes it unlawful for a broker or dealer to extend, or arrange for the extension of, credit without collateral or in contravention of the margin regulations promulgated by the Federal Reserve Board under the authority of Section 7. Regulation T, in turn, prohibits a broker-dealer from extending credit or arranging for the extension of credit collateralized by securities not listed on a national securities exchange.[26] 12 C.F.R. § 220.109. Since Alaska's tender offer financing is either unsecured or secured in part by unregistered securities,[27] it is clear that Regulation T and Section 7(c) of the '34 Act have been violated if Kuhn, Loeb "arranged" the loan from Chemical Bank ("Chemical"). The central legal question raised by defendants' charge is the scope of the term "arranging" as used in Regulation T.[28]

Apco and Energy jointly contend that *any* activity of a broker related to an extension of credit by another constitutes "arranging" unless the broker's sole "function, activity, or connection . . . is to execute the customer's orders and follow the customer's instructions as to the delivery of securities and receipt of payment," citing *In the Matter of Sutro Bros. & Co.,* 41 S.E.C. 443, 452 (1963). Alaska, on the other hand, argues that there can never be a finding of "arranging" absent an affirmative showing that the credit would not have been extended "but for" the broker's participation. According to Alaska, if credit would have been forthcoming anyway, a broker cannot have "arranged" the credit, regardless of the nature or degree of the actions undertaken by the broker. While I believe Alaska is closer to the mark, I am unable to accept either view.

It is clear that certain types of conduct by a broker in connection with an extension of credit constitute arranging. For example, the negotiation of a loan by a broker for its customer has been characterized in an SEC letter ruling as falling within the class of activities that constitute arranging. *Broker's Arranging of Credit,* CCH Fed.Sec.L. Rep. ¶ 79,464 at p. 83,299 (Aug. 3, 1973) [1972–73 Transfer Binder]. *See also In the Matter of Sutro Bros. & Co.,* 41 S.E.C. at 456. Similarly, the Federal Reserve Board has opined that a broker-dealer who proposed the completion of credit applications and promissory notes on behalf of its customers and, when executed, their submission to a bank having no preexisting relationship with the would-be borrowers, would be acting in violation of Reg.T. 12 C.F.R. § 220.109. Neither of these opinions addresses itself to whether the credit would have been extended "but for" the broker's activi-

25. Section 7(c), 15 U.S.C. § 78g(c), provides that:

It shall be unlawful for any member of a national securities exchange or any broker or any dealer . . . to extend or maintain credit or *arrange* for the extension or maintenance of credit to or for any customer—

(1) on any security . . . in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe . . . .

(2) without collateral . . . . (emphasis added)

26. Reg. T proscribes the use of "unregistered securities" as collateral for a loan extended or arranged by a broker-dealer. "Unregistered securities" are defined as securities not listed on a national securities exchange. 12 C.F.R. § 220.2(d).

27. In a related argument, the defendants maintain that the tender offer loan is "indirectly secured" and thus violates Regulation U, 12 C.F.R. § 221. See *infra.*

28. In addition to denying that Kuhn, Loeb "arranged" the tender loan, Alaska challenges the standing of defendants to assert claims under Reg. T. I find the argument unpersuasive. While the defendants may lack standing to sue Kuhn, Loeb directly for a violation of Reg. T, *see, e. g., Robbins v. Banner Industries,* 285 F.Supp. 758 (S.D.N.Y.1966); *Meisel v. North Jersey Trust Co.,* 218 F.Supp. 274 (D.N.Y.1963), they unquestionably have standing to allege that a tender offer fails to disclose that the financing on which it is based was obtained in violation of Reg. T. *Nachman v. Halfred,* CCH Fed.Sec.L.Rep. ¶ 94,455 (N.D.Ill.1973) [1973–74 Transfer Binder].

ties. Initiating contact with the lender and negotiating the loan present such a substantial risk of bringing about an extension of credit which the broker could not himself extend, that the agencies responsible for the interpretation and enforcement of Section 7 apparently consider such activities *per se* violations. It seems to the Court, however, that these agencies have taken a different view with respect to other broker-dealer activities less directly related to the extension of credit and, as will be discussed more fully hereafter, that the distinction seems warranted in light of the purposes of Section 7 and Regulation T. *Compare* 12 C.F.R. § 220.109 and *In the Matter of Sutro Bros. & Co.*, 41 S.E.C. 443 (1963) *with Junger v. Hertz, Neumark & Warner*, 426 F.2d 805 (2nd Cir. 1970).

The *Sutro Bros.* decision, rather than supporting defendants' somewhat draconian interpretation of arranging, expressly refused to adopt a standard whereby *any* acts by a broker for the purpose of assisting his customer in obtaining credit would constitute arranging. 41 S.E.C. at 451–2. Instead, the SEC, deeming it unnecessary to define the various situations short of initiation or negotiation that might involve a broker in unlawful arranging, stated that: ". . . we think it clear that when a broker permits himself to become the intermediary between customer and factor [29] with respect to the customer's account or dealings with the factor, as by conveying the customer's communications or instructions to the factor or by responding to requests or directives of the factor concerning the customer's transactions,[30] the broker becomes so involved in the extension or maintenance of credit for the customer by the lender as to be held to be arranging. *These are activities in relation to the credit absent which the credit would not be supplied by the factor.*" *Id.* at 457 (emphasis supplied). *See also In the Matter of Russell L. Irish*, 24 S.E.C. 777, 780 (1965), CCH Fed.Sec.L.Rep. ¶ 77,297 [1964–66 Transfer Binder]. This approach, whereby the degree of the broker's participation and its propensity to cause an extension of credit in a situation where credit might not otherwise be extended, has been followed by courts faced with challenges to activities allegedly conducted in violation of Regulation T. *See, e. g., Junger v. Hertz, Neumark & Warner*, 426 F.2d 805 (2nd Cir. 1970). *But cf. Weiss, Registration and Regulation of Brokers and Dealers*, 77, n. 28 (1965 ed.).

Regulations, like statutes, should be interpreted in a manner designed to effectuate their underlying purpose. This principle, which has been given express recognition by the Federal Reserve Board in its interpretations of Regulation T, *see* 12 C.F.R. § 220.119 *citing United States v. American Trucking Ass'n*, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), and 2 J. Sutherland, *Statutes and Statutory Construction*, Chap. 45 (3d ed. 1943), necessitates an examination of the purposes underlying Regulation T and Section 7(c) of the '34 Act. Comment, "Application of Margin Requirements to the Cash Tender Offer." 116 Pa.L.Rev. 103, 112–116 (1967). *See generally*, Karmel, "The Investment Banker and the Credit Regulations", 45 N.Y.U.L.Rev. 59 (1970).

There appear to have been three rationales for Congress' decision to include credit controls in the Securities Exchange Act of 1934. 2 *L. Loss, Securities Regulation* § 1242–3 (1961 ed.); Comment, 116 Pa.L.Rev. 103, 114–5

29. At the time *Sutro Bros.* was decided, no limitations were placed upon the extent of credit that could be offered by factors for the purchase of securities.

30. The broker-dealer in *Sutro Bros.* allowed a factor ready access to its margin department and continuously provided the factor with information concerning the trading accounts of customers whose stock transactions were being financed by the factor. These activities appear to be the type of conduct characterized by the Commission as "responding to requests or directives of the factor concerning the customer's transactions.

(1967). "First, it intended to limit and control speculation which diverted credit resources into the stock market. . . ." *Id.* at 114. Second, there was Congressional solicitude for the "lamb", the small investor who purchased securities on an extremely thin margin, such that "a person cannot get in the market on a shoe string one day and be one of the sheared lambs when he wakes up the next morning." 78 Cong.Rec. 7700 (1934). And see authorities cited in Comment, 116 Pa.L.Rev. at 114, n. 65. Third, Congress was concerned with undue market fluctuations caused or exacerbated by the presence of excessive credit in the securities markets. *Id.; Lewyn, Financing Takovers,* Second Annual Institute on Securities Regulations, 258, 263 (1971).[31]

In translating these purposes into a regulatory scheme, the Federal Reserve Board has, in Regulation T, restricted the securities-related credit activities of brokers to a far greater extent than those of banks. *Lewyn, Financing Takeovers,* Second Annual Institute on Securities Regulation, 258, 262 (1971). *See generally,* 2 *L. Loss, Securities Regulation,* C. 7G (1961 ed.). For example, no restrictions exist upon the amount of bank credit issued for the purpose of purchasing securities in the absence of such credit being collateralized by stock. *Compare* Reg. T, 12 C.F.R. § 220 *with* Reg. U, 12 C.F.R. § 221. By contrast, brokers are prohibited from extending or arranging credit on an unsecured basis for the purchase of securities. The motivation behind this difference in treatment would appear to be a belief that bankers would act with greater discretion in extending credit than would brokers who stand to gain not merely from charging interest on any credit extended, but also from the commissions generated by effecting stock transactions for their customers. *See* Comment, 116 Pa.L.Rev. at 129. In particular, the broadening of restrictions on a broker's credit activities to include "arranging" as well as "extending" credit by brokers, appears to be aimed at preventing brokers from promoting their own pecuniary self-interest by obtaining from a third party the financing necessary to enable a customer to engage in a speculative transaction that might not otherwise be made. *See* 5 *L. Loss, Securities Regulation,* § 3279 (1969 Supp.) and authorities cited therein. *See also,* Comment, 116 Pa.L. Rev. § 9429, n. 124.

Assuming that Alaska's tender loan is neither directly nor indirectly secured by stock collateral,[32] Chemical's extension of credit would be entirely consistent with the regulatory scheme. The only regulatory concern which could be implicated relates to the limitation on the flow of credit to the market imposed by the Reserve Board's restriction on credit secured through broker-dealers. If taint is to be found in these circumstances, it must be predicated on a finding of a substantial likelihood that Kuhn-Loeb's activities resulted in the extension of credit that Chemical would not otherwise have extended. While I agree that a showing of initiation of contact or negotiation of the loan would suffice to support such a finding, I believe less direct involvement without some further evidence of a causal relationship should not suffice. A different conclusion would unnecessarily discourage legitimate and constructive activities of investment banking firms in situations of this kind without materially advancing the purposes of Regulation T.

31. Although various commentators, given these Congressional goals, have questioned whether the margin regulations should be applied to the financing of tender offers, *see, e. g.,* Comment, 116 Pa.L.Rev. 103; Karmel, "The Investment Banker and Credit Regulations," 45 N.Y.U.L.Rev. 59, the Federal Reserve Board has applied Reg. U to a tender offer loan, 12 C.F.R. § 221.110(2), apparently in the belief that it would serve the Congressional goal relating to limitation of the quantity of credit in the national securities markets.

32. As the Court so holds in sub-section G, *infra.*

With these standards in mind, I turn to an analysis of the record.

Kuhn, Loeb did not initiate contact between Alaska and Chemical. The Chemical-Alaska credit relationship dates back to 1970; Kuhn, Loeb was not retained by Alaska until April of 1974. Moreover, Chemical had been the "lead bank" in Alaska's bank financing for over a year when the tender offer loan matter first came up. Nor will the record support the contention that Kuhn, Loeb "directly participated in the negotiations." Defendants' argument is thus reduced in scope to the contention that Kuhn, Loeb became an "intermediary" and for that reason must be held to have arranged the loan in violation of Regulation T. The principal support for this contention stems from two meetings held in mid-June of this year. While Kuhn, Loeb's participation in the second of these meetings might, in a sense, be described as placing it in the role of "intermediary", I conclude that Kuhn, Loeb participation in these meetings does not approach the type of conduct referred to in the *Sutro* case as "activities . . . absent which the credit would not . . . [have been] supplied."

On June 12, 1975, a meeting was held between representatives of Alaska and Chemical. The purpose of this meeting was to seek financing for the Alaska tender offer and Mr. Wright of Kuhn, Loeb did attend. After Mr. Honig presented Alaska's plans for the tender and the possibility of combinations with Apco and Alaska thereafter, Mr. Wright expressed the view that the combinations would be "sound" and "would result in a good result for . . . all three companies." [33]

The Court agrees that Kuhn, Loeb participated to this degree in Alaska's efforts to secure credit for its tender, but concludes that defendants exaggerate the significance of that participation. First, it is clear from the record that Alaska, and not Kuhn, Loeb, was the moving force both in arranging and running the June 12th meeting.[34] The recollection of those present at the meeting indicates that the participation by Mr. Wright was minimal and that Mr. Honig of Alaska "handled that meeting." [35] While it is true that the participants in the meeting can be described in varying degrees as "interested", their testimony is corroborated in some degree by the testimony of the other bankers approached by Alaska for credit about the same time. They have indicated that the participation of Kuhn, Loeb was tangential and generally passive.[36] Finally, it is necessary to put the June 12, 1975 meeting in context. As previously noted, Chemical was Alaska's lead bank before that meeting and representatives of Alaska met with the Chemical people on other occasions after that meeting in pursuit of the tender loan without Kuhn, Loeb being present.

Defendants additionally point to a subsequent meeting involving Mr. Mazzuto of Chemical and three Kuhn, Loeb representatives, Mr. Snowden, Mr. Jenkins and Mr. Konomos. The meeting was held at Mr. Mazzuto's request so that he might ask further questions about figures previously presented by Alaska to the bank. His questions dealt mainly with the assumptions utilized in the cash flow and earnings projections.[37] The Kuhn, Loeb representatives were unable to provide answers to most of these specific inquiries,[38] and Alaska personnel were called on the telephone during the meeting in order to enable

33. Dep. of Wright, Docket # 71, at 7–8.

34. Dep. of Honig, Docket # 72, at 76; Dep. of Wright, Docket # 71, at 7, 9.

35. Dep. of Bullen, Docket # 70, at 58–9; see also Dep. of Troubh, Docket # 73, at 36.

36. Dep. of Pelley, Docket # 157, at 15–20; Dep. of Foster, Docket # 160, at 22–8.

37. Dep. of Mazzuto, Docket # 164, at 60–1, 64–5; Dep. of Jenkins, Docket # 162, at 35–6; Dep. of Snowden, Docket # 166 at 34–5.

38. Dep. of Snowden, Docket # 166, at 34–5.

Mr. Mazzuto to ". . . question some of their numbers." [39]

In sum, the current record indicates to the Court that Alaska secured its own credit for the tender. Kuhn, Loeb's contact with Chemical was insignificant and did not create any substantial risk that credit was extended which would not have been extended absent its participation. Accordingly, defendants have not presented a substantial issue of a Regulation T violation.

G. *The Failure Of Disclosure With Respect to Regulation U.*

Apco and Energy also attack the credit extended by Chemical to finance the Alaska tender offer on the ground that it violates the margin requirements of Regulation U. 12 C.F.R. § 221. In general terms, Regulation U prohibits a bank from extending credit for the purpose of purchasing margin stock [40] where such credit is secured directly or indirectly by *any* stock in an amount exceeding the maximum loan value of the collateral.[41] The maximum loan value of stock is currently defined [42] as 50 percent of current market value. It should be noted, however, that Regulation U is limited in scope and reaches *only* credits extended for the purpose of purchasing where such credit is directly or indirectly secured by any stock.[43] *Cooper v. Union Bank,* 354 F.Supp. 669, 675 (C.D.Cal.1973). Thus, the margin requirements are inapplicable to any stock purchase bank loans not secured by stock. *Lewyn, Financing Takeovers,* 258, 259, Second Annual Institute on Securities Regulation (1971); *Cooper v. Union Bank, supra* at 675.

No one here disputes that, if applicable, the margin requirements of Regulation U are not met by Chemical's $43.5 million loan to Alaska. Instead, the parties clash sharply over whether the strictures of Regulation U apply to this loan. In particular, Apco and Energy insist, and Alaska denies, that the tender offer loan is *indirectly* secured by the stock of Alaska's subsidiaries.

Defendants' principal argument is that Chemical and Alaska designed the terms of the tender offer loan and another financing agreement to provide the substance of a secured loan without its form in an effort to circumvent Regulation U. The facts pertaining to this argument are as follows.

In the Spring of 1975, Alaska negotiated a refinancing of its bank debt in order to secure more favorable terms. Negotiations were virtually completed during May and the related instruments were thereafter finalized and circulated among the seven participating banks for execution.[44] By June 26, 1975 a credit agreement ("secured loan") dated as of May 30, 1975 had been executed by Alaska and the banks. This agreement [45] provided for a total loan commitment of $38.7 million, $28.7 million to be evidenced by five year term notes and $10 million in the form of a revolving credit until May 30, 1977. These loans were secured, pursuant to a Pledge and Security Agreement ("Pledge Agreement") [46] by the stock of specified Alaska subsidiaries. In addition, the Pledge Agreement required that Alaska

39. Dep. of Mazzuto, Docket # 164, at 60–1.

40. The term "margin stock" is defined to include, *inter alia,* a "stock registered on a national securities exchange. . . ." 12 C.F.R. § 221.3(v).

41. 12 C.F.R. § 221.1(a) provides, in part, ". . . no bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any margin stock in an amount exceeding the maximum loan value of the collateral. . . ."

42. 12 C.F.R. § 221.4(a).

43. 12 C.F.R. § 221.3(m).

44. The seven banks were Chemical Bank, Bankers Trust Company, The First National Bank of Chicago, Bank of the Southwest National Association, First City National Bank, Seattle-First National Bank and Wells Fargo Bank National Association.

45. Docket # 62, Exh. GGG.

46. *Id.*

place the pledged shares with Chemical, the "lead" bank, until the obligations were paid in full or until December 31, 1975 if Alaska had complied with certain conditions in the interim.[47]

On June 12, 1975, Alaska approached Chemical about a tender offer loan.

On July 3, 1975, Chemical executed a Commitment Agreement ("Chemical Commitment") [48] which provided that it would supply financing on an unsecured basis for Alaska's tender offer. Among the conditions placed on Chemical's actual extension of credit for this purpose was the requirement that Chemical's position in the secured loan be assumed by another bank. The Chemical Commitment also provided that the terms of the tender offer loan would stipulate that Alaska "shall have the right to sell the stock of any subsidiary at any time." These provisions resulted from the fact that from the outset of the tender loan discussions, a Regulation U problem was perceived to exist if Chemical had outstanding at the same time an unsecured "purpose" [49] loan and a secured "nonpurpose" credit.[50]

Simultaneously, Bankers Trust executed a similar Commitment Agreement ("Bankers' Commitment") [51] whereby it agreed to take over Chemical's position as lead bank on the secured financing and assume its obligations under the secured loan agreement. A condition precedent to the Bankers' Commitment was modification of the Pledge Agreement to require that the secured stock remain pledged and in the hands of Bankers Trust until the obligation was paid in full.[52]

On July 25, 1975 two amendments to the secured loan were executed which implemented the Chemical and Bankers' Commitments.[53] The total commitment on the secured loan was reduced to $28.4 million, with the share assumed by Bankers Trust increasing from $7 million to $19.1 million.

On the same day Chemical and Alaska entered into a Credit Agreement ("unsecured loan") [54] to provide financing in the amount of $43.5 million for Alaska's tender offer and the prepayment of certain indebtedness. This agreement provided for the execution of promissory notes payable in 24 equal installments commencing March 31, 1976 and ending December 31, 1981. The incurring of additional bank debt without Chemical's approval was prohibited and default in the payment on any other debt for borrowed money was made a default which would accelerate Alaska's payment obligations under the unsecured loan.

On July 28, 1975 the Pledge Agreement was amended by letter.[55] Pursuant to the Bankers' Commitment, the Pledge Agreement was modified by deleting the provision which allowed withdrawal of the pledged securities on December 31, 1975.

47. The Agreement also contained standard negative covenants against encumbrance of assets with certain specified exceptions. Under its terms, however, Alaska could sell subsidiaries, other than the pledged stock, as long as the proceeds, after expenses, were paid on the notes.

48. Docket # 53B, Exh. YY.

49. A credit obtained "for the purpose of purchasing or carrying any margin stock" is often referred to as a "purpose credit." 12 C.F.R. § 221.1, n. 3.

50. In such situations the Federal Reserve Board has indicated that it would view the "purpose" loan as indirectly secured. 12 C.F.R. § 221.120.

51. Docket # 129A, Exh. 36.

52. The Bankers' Commitment referred to deletion of paragraph 6(a) of the Pledge Agreement. This has been treated as a typographical error since the subsequent amendments to the Pledge Agreement deleted paragraph 6(b). Treating the reference in the Bankers' Commitment as 6(b) rather than 6(a) accords both with the parties' actions and with reasonable interpretation of the two agreements.

53. Docket # 129A, Exh. 37.

54. Docket # 129A, Exh. 34.

55. Docket # 129A, Exh. 40.

1. *The Scope of Regulation U.*

At the outset it is clear that Regulation U is applicable to tender offers. The Federal Reserve Board has specifically rejected an argument that tender offer financing should be considered exempt from Reg. U because tender offers do not involve market speculation. 12 C.F.R. § 221.110(b)(2). *Lewyn, Financing Takeovers* 258 (1971).

It is also settled that less than the typical perfected security interest is contemplated by the Regulation's application of the margin requirements to purpose loans that are secured "directly or indirectly" by stock. *Freeman v. Marine Midland Bank,* 494 F.2d 1334, 1339 (2nd Cir. 1974) ("The regulation does not require that a lender take any of the steps usually necessary to create a legally enforceable security interest.") Any other interpretion would, of course, render the term "indirect" meaningless. 12 C.F.R. § 221.113(d). Also, the definition of "indirectly secured" [56] refers to *any* arrangement with the customer and thus by its terms obviously includes informal understandings and situations which have the practical effect of circumventing the purpose of the regulation. See *Cooper v. Union Bank, supra,* at 675.

An examination of the purposes behind Regulation U sheds still more light on the concept of "indirect" security. In 1963, the SEC indicated that its primary concern in the area of credit controls

> is the efficacy of security credit controls in preventing speculative excesses that produce dangerously large and rapid securities price rises and accelerated declines in the prices of given securities issues and in the general price level of securities. . . . When forced sales occur and put pressure on securities prices . . ., they may cause other forced sales and the resultant snowballing effect may in turn have a general adverse effect upon the entire market.

*Report of Special Study of Securities Markets,* Ch. X at 9 (1963). *See, generally,* Comment, 116 Pa.L.Rev. 103; *Lewyn, Financing Takeovers, supra* at 263. Given this concern that a creditor might sell off stock pledged as collateral when its debtor's margin is lowered by a decline in the collateral's market value induced by an adverse market break and thus accentuate an existing downward trend, it appears that in determining what arrangements should be construed as falling within the definitions of "indirectly secured" attention should be focused upon a lender's access to the customer's securities. *See* Comment, 116 Pa.L.Rev. at 119–125. The Federal Reserve Board has followed this approach in its interpretation of Regulation U. Thus, it has indicated that "any arrangement under which stock is more readily available as security to the lending bank than to other creditors of the borrower may amount to indirect security. . . ." 12 C.F.R. § 221.113(e). *See Cooper v. Union Bank, supra* at 677.

However, the Federal Reserve Board has gone further in defining "indirect" security and relied, not merely upon the lender's access to the stock collateral, but upon restrictions on a borrower's right of alienation as indicia of "indirect" security. *Compare* 12 C.F.R. § 221.113(e) *with* 12 C.F.R. §§ 221.3(c) *and* 221.113(f). Thus, in describing typical arrangements which would constitute "indirect" security, the Board has pointed to two situations where the borrower's ability to alienate or pledge his stock was circumscribed, but the lender, as a practical matter, would be unable to seize the collateral and sell it in the event of a market break that placed the borrower's loan in jeopardy. *See* 12 C.F.R. § 221.113(f)(2) and (3). The Board's reason for its conclusion is particularly instructive with regard to a broader purpose served by Regulation U.

56. 12 C.F.R. § 221.3(c).

It stated: ". . . the mere fact that the stock is out of the borrower's control for the duration of the loan serves to some extent to protect the bank," 12 C.F.R. § 221.113(f)(3). The apparent rationale behind this interpretation is that an additional purpose served by Regulation U is the limitation of credit flowing to the securities market. Implicit in the extension of "indirect" security to reach situations where the anti-market fluctuation motivation is absent is the recognition that banks will be less willing to extend unsecured, as opposed to secured, credit. Comment, 116 Pa.L.Rev., *supra*, at 129. By preventing banks from extending credit in situations where some comfort is given to the lender by virtue of restrictions upon a borrower's rights of alienation, *see, e. g.*, 12 C.F.R. § 221.113(f)(3), the effect may well be to extinguish purpose credits that would not be granted by a bank on a totally unsecured basis.

Accordingly, in evaluating any arrangement which is alleged to be indirectly secured solely because of restrictions on the borrower's right to alienate his assets, the touchstone must be whether the bank has relied upon the borrower's stock as collateral in making the decision to extend the credit. The Federal Reserve Board has recognized this principle in Regulation 221.3(c) which provides in part:

> The term "indirectly secured" includes any arrangement with the customer order which the customer's right or ability to sell, pledge, or otherwise dispose of stock owned by the customer is in any way restricted so long as the credit remains outstanding or under which the exercise of such right . . . is or may be cause for acceleration of the maturity of the credit: Provided, That the foregoing shall not apply (1) if such restriction arises solely by virtue of an arrangement with the customer which pertains generally to the customer's assets unless a substantial part of such assets consists of stock, or (2) *if the bank in good faith has not relied upon such stock as collateral in the extension or maintenance of the particular credit.* . . . (emphasis supplied)

One of the purposes of this Regulation "was to make it clear that Section 221.3(c) does not apply to certain routine negative covenants in loan agreements where the bank in good faith has not relied upon . . . stock as collateral." 12 C.F.R. § 221.118(b).

2. *The Tender Offer Financing.*

Apco and Energy maintain that the combined effect of the secured and unsecured credit agreements is to give Chemical "indirect" security for its otherwise unsecured loan. More specifically, their argument is as follows. First, the effect of re-extending the Pledge Agreement until the secured indebtedness has been satisfied was to provide assurance that during most of the duration of Chemical's tender loan the pledged stock would in all likelihood remain in the hands of Bankers and not be alienated. Second, the default provisions of the tender loan were designed to assure that if the secured creditors foreclose on the collateral, the tender loan would be accelerated. Third, it is stressed that the provision of the tender loan requiring Chemical's prior approval before Alaska can incur additional indebtedness from a bank serves to minimize the number of creditors who might otherwise share with Alaska in the event of a default on the secured loan or the tender offer loan.[57] Since Alaska has no significant current bank debt other than the secured and tender loans and no one disputes that the current value of the pledged stock is sufficient to pay out both loans, defendants conclude that the effect of the two loans is to give Chemi-

57. Under the terms of the secured loan, default in the payment of interest or principal on the tender loan would give 50% in interest of the secured banks the right to accelerate the secured loan.

cal an indirect security interest in the pledged stock. Finally, defendants assert that if there were otherwise any doubt about whether Chemical relied upon the pledged stock in extending the tender credit, that doubt is dispelled by a memorandum to Chemical's credit committee which, according to defendants, demonstrates that Chemical did in fact look upon the stock pledged under the secured loan as collateral for its unsecured loan.

Before proceeding to an analysis of this argument, it is important to note several things about the tender offer financing and its relationship to the secured loan.

First, when Chemical committed to the tender loan, Bankers Trust simultaneously committed to take its place in the secured loan. Similarly, when Chemical signed the tender offer loan agreement it had been relieved of all responsibility under the secured loan and pledge agreements.

Second, the Court is convinced that the terms of the present secured loan, with the exception of the elimination of the possibility of a termination of the pledge in six months, were agreed upon prior to the negotiation of terms of the tender offer loan.

Third, the pledged stock is held by Bankers Trust for the benefit of the secured banks and there is no evidence of any agreement, tacit or otherwise, between Chemical and any of the secured banks that Bankers will hold the pledged shares for the duration of the tender offer loan or, in any other way, act to protect Chemical's interest.[58] During the term of the pledge, Chemical, accordingly, has no access to the pledged stock which puts it in any better position than any other judgment or general creditor.

Fourth, while the tender offer loan prohibits additional bank borrowing, it expressly permits borrowing, the proceeds of which are to be applied in repayment of the secured loan, which by its terms is prepayable without penalty. Chemical, accordingly, has no legal or practical protection against a refinancing of the secured loan on eased terms. If the secured banks have as little interest in the pledge as defendants would have the Court believe, a premature termination of that pledge would seem to be more than merely a remote possibility.

Fifth, the tender offer loan expressly provides that "nothing contained [therein] . . . shall prevent the company or any subsidiary from selling, transferring or otherwise disposing of any equity securities of any subsidiary, or any securities of Apco or any subsidiary thereof."[59] This provision has current effect since not all securities currently owned by Alaska are pledged and any of Apco's shares purchased will not be subject to the pledge agreement. If the secured loan were refinanced, this provision could, of course, have a much broader application.

Sixth, and finally, Alaska is not a company which holds securities for investment. It is an operating company which functions primarily through wholly-owned subsidiaries. This is significant, I believe, in addressing the question of whether such restrictions as there are on Alaska's ability to alienate assets under the non-purpose loan indicate that Chemical relied upon the pledged stock. Every lender responding to an application for an unsecured loan considers the assets of the proposed borrower in making a decision on the extension of the credit and, if the consideration given by Chemical to Alaska's assets was nothing more than or different from what it would have been if Alaska conducted its operations through corporate divisions, I do not see such consideration as establishing that Chemical relied upon the stock as collateral. Put another way, if the fact that a corporation's ownership of operating assets is evidenced by stock adds nothing to the

58. Compare 12 C.F.R. § 221.113(f)(3).

59. Section 4.01, Exh. 34, Docket # 129A.

security of the bank's position and it would, accordingly, have made the same loan on the same terms to the same enterprise operating through divisions, it is difficult to see how the objective of the regulatory scheme is circumvented by the loan.[60]

In analyzing the defendants' Regulation U argument, I start with the proposition noted above that this is not a situation where Chemical has put itself in a better position than other unsecured creditors with respect to the pledged stock. Moreover, while the tender loan forecloses further bank borrowings by Alaska without Chemical's consent, this does not appear to the Court to be significant in the context of Regulation U.

Apco and Energy's best argument rests upon the fact that Alaska's right to alienate the pledged stock may be suspended under the secured loan during most of the duration of the tender loan and that default under the secured loan may result in acceleration of the tender loan. I am inclined, however, towards the view that the independence of the secured banks for whose benefit the restrictions on alienation of the stock were imposed is a complete answer to this argument. The Board's interpretation of the Regulation dealing with restrictions on the borrower's access to his stock can clearly be read to be concerned with arrangements between the lending bank and the borrower (which may include a third party acting for the benefit of the bank), and not with the impact of a prior and independent secured credit agreement on the position of an otherwise unsecured bank which has no control over that agreement. I need not so hold, however, because the record suggests that Chemical did not "rely upon the stock as collateral" for the extension of credit within the meaning of the Board's interpretations.

The Federal Reserve Board in interpreting the "no reliance in good faith" exception has delineated two criteria which it believes indicate that a bank has not in fact relied upon stock as collateral. 12 C.F.R. § 221.117(b).[61] These two criteria, that the loan have fixed maturity dates rather than being payable on demand or in the event of market fluctuations and that the bank have examined financial statements of the borrower which can reasonably be interpreted to support the loan, are both satisfied in the instant case. Satisfaction of the first of those criteria is clear. The unsecured loan is payable in fixed installments over a six-year period and is not tied to fluctuations in the market value of the shares pledged under the secured loan. Satisfaction of the second requires further discussion, however.

While defendants concede that Alaska's current financials and other extensive financial information and forecasts were supplied to Chemical, they contest that they support the tender loan and argue that Mr. Mazzuto's memorandum to the credit committee demonstrates that the tender loan would not have been made without the assurance to be provided by an extended pledge agreement. The evidence indicates to the Court,

60. Regulation 221.3 indicates that restrictions on alienation and encumbrance of assets must be viewed differently in the context of holding companies than in other contexts, but it assumes the possibility of a situation where alienation of a holding company's stock is restricted but the bank nevertheless "in good faith has not relied upon the stock as collateral."

61. 12 C.F.R. § 221.117(b) provides, in part, that:

> . . . [S]ome indication that the bank had not relied upon stock as collateral would seem to be afforded by such circumstances as the fact that (1) the bank had obtained a reasonably current financial statement of the borrower and this statement could reasonably support the loan, and (2) the loan was not payable on demand or because of fluctuations in market value of the stock, but instead was payable on one or more fixed maturities which were typical of maturities applied by the bank to loans otherwise similar except for not involving any possible question of stock collateral.

however, that Chemical, which was already familiar with Alaska's position, considered the available data and concluded in good faith that it would support the loan.[62] This judgment, as the Mazzuto affidavit indicates and as one would expect, was based upon an evaluation of Alaska's ability to service the loan and on a "worst-case" projection which placed values on Alaska's subsidiaries in order to ascertain whether the bank could come out whole in the event Alaska did not continue as a viable enterprise. Undeniably, this "worst-case" projection supports the loan. The question, however, is whether it shows reliance on the pledged stock.

The complete text of Mr. Mazzuto's memorandum is set forth in the margin.[63] The Court does not agree that it demonstrates reliance on the Pledge Agreement as protection for Chemical. Two things, in particular, should be noted. First, the "largest exposure" to Chemical is seen as a situation in which the pledge remained outstanding. Second, the evaluation of Alaska's principal holdings included its stock in Energy and 51% of Apco's stock, securities which were not pledged or to be pledged under the secured loan. In this context, it can be said that Chemical relied in part upon Alaska's asset position; it cannot be said that it relied upon the continuation of the Pledge Agreement.

The Board has also suggested factors which would support a conclusion that a loan is indirectly secured by stock. *See* 12 C.F.R. § 221.113(g). Both of these factors, namely "that the stock in question was purchased with proceeds of the loan" and "that the lending bank suggests or insists upon the arrangement" are absent here. Under the terms of the secured loan and the Pledge Agreement any shares of Apco purchased by Alaska do not become pledged under the secured loan. Nor did Chemical insist upon or suggest the re-extension of the Pledge Agreement.[64] The evidence indicates that this extension was suggested to Bankers Trust by Alaska in an effort to induce Bankers Trust to nearly triple its participation in a secured loan.[65] Given the increase in the Bankers Trust com-

62. Dep. of Mazzuto, Docket # 164, at 38–9, 42–3, 55, 62–3, 78; Dep. of Bryan, Docket # 154, at 84–8, 106–7; Dep. of McBride, Docket # 163, at 43–6; Dep. of Paynter, Docket # 158, at 88–90 103–7; Aff. of Mazzuto, Docket # 191, Exh. C to Parker Aff.; Aff. of Kelsey, Docket # 180.

63. We are recommending that Chemical Bank provide $30,000,000 in a standby/5 year equally amortizing term loan to Alaska Interstate which will be used to buy 51% of Apco Oil. The loan will be unsecured and priced at Prime + 1½%, 20% balances, and an appropriate fee. We are recommending that two credits be set up, one secured by the stock of the present subsidiaries which we will not be in, and one financed entirely by Chemical which will be used in the tender.

The situation which we are asking for approval is one where the largest exposure would be where a $38,000,000 bank group secured by the stock of all present subsidiaries would have a preferred position. This would be negated to an extent as that facility plus ours, maximum total of $68,000,000 would be the only debt with the values of the subsidiaries estimated as follows:

Alaska Pipeline—$32,000,000—8x earnings with a 17 year reserve life
Lockwood Corp.—$20,000,000—5x 1974 earnings
Anlin Companies—$10,000,000—4x 1976 earnings based on oil company contracts
Kranco—$3,000,000—5x 1974 earnings (2x 1973 earnings)
National Aircraft—$5,000,000—60% of book value
Sauder—$1,500,000—book value
VICO & Huffington—$15,000,000—9% discounted value of natural gas reserves
Northwest Pipeline—$15,000,000
51% of acquired company—$8,000,000—50% of market

TOTAL: $112,500,000

If ⅔ of the above values are realized, both bank groups are paid out. We have received company supplied projections which indicate more than adequate cash flows to pay the additional debt. Please see attached analysis for further details.

Approval in principle is recommended.

64. Aff. of Mazzuto, Docket # 191, Exh. C, ¶ 5 to Parker Aff. The evidence on this point is uncontradicted.

65. Dep. of Pelley, Docket # 157, at 39–41.

mitment and the fact that an additional indebtedness of $43.5 million was to be placed upon Alaska's cash flow capacity, it is logical that Alaska would have offered this concession in an effort to obtain the working capital supplied by the secured loan.

In summary, none of the criteria suggested by the Board for determining the issue here presented would support a finding that the tender loan is "indirectly secured". The evidence indicates (1) that Chemical's conduct was entirely consistent with that of a bank evaluating and extending an unsecured credit, (2) that the existence of prior secured interests was not viewed as a plus factor and (3) that the tender credit would have been extended in the absence of the re-extension of the Pledge Agreement. It follows that Alaska's alleged failure to disclose a Regulation U violation will not support the preliminary injunction sought.

### H. *The Alleged Failure To Disclose Alaska's Possession Of Inside Information.*

The Alaska tender states that it "has not had access to any information concerning . . . [Apco] other than publicly available information." While there is some evidence that Mr. Honig was present at an Energy Board meeting sometime in the Spring when a "thick report" on a proposed Energy-Apco joint project was distributed, there is no evidence which suggests to the Court that Alaska had possession of any inside information about *Apco* which would be material to the tender.

Concededly, Mr. Honig did receive confidential financial information about *Energy* in his capacity as a director and as Chairman of its Executive Committee. Energy's "principal" argument in this area is that it would "have had a considerable prophylactic effect if they had just let the shareholders know, 'look, we know something you don't know.' " The short answer is that this information was implicit in Alaska's disclosure of the offices Mr. Honig held in Energy.

Energy does not point to anything specific in the way of confidential Energy information that should have been disclosed as material to Apco stockholders. It does, however, stress that Kuhn, Loeb was given confidential financial information about Energy in connection with its office as financial advisor to Alaska. In the Court's judgment, this in fact is not of material significance in the context of the tender offer. The only evidence of use of this data by Kuhn, Loeb is a reference to Energy's projected earnings for 1975 in a memorandum which arrives at an estimated value of the Energy shares and certificates. The memo itself demonstrates that Kuhn, Loeb's opinion on this subject was based on publicly available information.[66]

### I. *The Alleged Diversion Of A Corporate Opportunity Of Energy And The Failure To Disclose It.*

Energy maintains that Alaska is engaged in an effort to usurp a corporate opportunity of Energy and has failed to disclose that fact to Apco stockholders. I do not understand Energy to suggest that either the opportunity to purchase outstanding shares of Apco stock or the opportunity to acquire Apco's Energy shares is a corporate opportunity of Energy.[67] Rather, Energy's argument is based upon evidence that it has been an acquisition-minded firm in the energy field and that its Chief Executive Officer, Mr. McMillian, had commenced

66. Falls Aff., Exh. K, pp. 5–6, Docket # 53B.

67. The opportunity to purchase Apco's shares has, of course, been known and available to Energy since its organization. There is no evidence to indicate that it had any interest or expectancy in purchasing Apco stock prior to the Alaska tender and, indeed, the Court believes it more likely than not that there would have been no Energy tender if Alaska had not made a tender first. As to Apco's Energy shares, see *Carey, Corporations*, pp. 678–9 (4th ed. 1969).

discussion with Apco representatives in May of 1975 with a view to the possible acquisition of certain oil and gas properties held by Apco.[68]

The record suggests Mr. Honig and Alaska had no knowledge of these negotiations until Mr. McMillian's July 6, 1975 letter in response to Alaska's notice of its intention to tender.[69] I have doubt whether the record supports the assertion that Mr. Honig should have realized in the absence of such notice that Energy had an expectancy in these Apco assets and, in any event, whether Mr. Honig's position with Energy and Alaska's 7½% stock interest in Energy would provide a predicate for a holding that Alaska's tender breached a fiduciary duty to Energy. I need not decide the matter at this point, however, since I conclude that, even if such a breach had been established, it would not warrant injunctive relief against the Alaska tender.

If the Alaska tender is found to have been an actionable diversion of a corporate opportunity of Energy, the Court will be in a position for some indefinite period in the future to remedy the situation by directing conveyance of the assets in dispute to Energy and by an award of appropriate damages.[70] If the Alaska tender is enjoined, however, and Energy ultimately loses on its corporate opportunity theory, in all likelihood, I will be unable to restore a situation affording Apco stockholders the opportunity to sell their Apco stock in a market produced by competing tenders. The balance of the equities, accordingly, does not weigh in Energy's favor.

So far as Alaska's disclosure in this area is concerned, I conclude that Alaska's amended materials give ample notice of the allegations and facts necessary for a stockholder to determine for himself whether Alaska has engaged in inequitable conduct.[71]

## III. THE ATTACK ON THE ENERGY OFFER.

### A. *The Alleged Failure To Disclose Material Inside Information Obtained From Apco.*

#### 1. *The Apco Forecasts.*

Energy's tender offer materials contain the following statement:

> [A]t the request of Energy, Apco has furnished extensive business and financial information to Energy, including forecasts of capital expenditures, forecasts of non-cash items, forecasts of contributions from operations to cash flow, debt repayment schedules.
>
> . . .

Neither immediately following nor anywhere else in the tender offer materials does Energy elaborate on or set forth the specific information furnished and intended to be described by the foregoing quoted sentence. The evidence discloses that Energy received from Apco an appraisal of its oil and gas reserves (The DeGolyer & MacNaughton Report or "the D & M Report") and a "Rough Working Schedule" prepared by Apco's accounting department. These documents will be discussed hereafter. So far as the Court has been able to ascertain, these are the only documents in the record which were actually delivered to

68. Energy also points to year old negotiations between it and Apco with a view to a possible joint venture. It does not follow from the fact of these negotiations, however, that Alaska's acquisition of Apco will deprive Energy of any corporate opportunity it may have in this area.

69. *See, e. g.*, McMillian Dep. pp. 305–6, 101–103, 136–145, 303–05.

70. It is conceivable that an Alaska-Apco merger could complicate the matter, but we do not currently know when, if at all, such a combination will occur and, if so, whether it will jeopardize effective relief. That can be evaluated, if necessary, when a concrete proposal has been made.

71. I have considered Energy's argument based on Section 13(d) of the Exchange Act and have concluded that, even if a violation occurred as claimed, this would not warrant an injunction against Alaska's tender.

Energy by Apco. The record reflects, however, that an Apco representative did confer with Energy representatives and discussed with them "a one page summary of consolidated cash flows, which was part of [Apco's] three year plan".[72] Based upon a representation of counsel[73] and the statement in the tender materials, I assume for present purposes that the information conveyed on this occasion also included similar forecasts of "capital expenditures, forecasts of non-cash items, and debt repayment schedules." The only other record evidence regarding the character of this information is set forth in the affidavit of Apco's President:

> The forecasts referred to in the Energy offer are preliminary forecasts which were prepared as a tool to assist the management in formulating company policies. The forecasts were never designed for, nor in fact available for, public dissemination.[74]

This Court has recently had occasion to discuss the dangers inherent in the disclosure of so-called "soft" corporate information. *Denison Mines Limited v. Fibreboard Corporation*, 388 F.Supp. 812 (D.Del.1974). In *Denison*, this Court relied in particular on the Third Circuit's statement in *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255 (3rd Cir. 1972), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972), of the "general rule" that "presentations of future earnings, appraised asset evaluations and other hypothetical data in proxy materials" was to be discouraged. 458 F.2d at 265.

This Court recognized in *Denison*, however, that no hard and fast rule could be drawn about "soft information". The distinction between soft information which must be disclosed and that which need not be was recognized as "one of degree", with determination of those categories to rest upon such factors as the importance of the information, the amount of subjective judgment which the information reflects, and the practical difficulties in fashioning a disclosure which would not create "more potential for misunderstanding than enlightenment."

Alaska here relies principally on *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228 (2nd Cir. 1974) and *Securities & Exchange Commission v. Lum's, Inc.*, 365 F.Supp. 1046 (S.D.N.Y.1973) as demonstrating that Energy had a duty to disclose more of the information supplied by Apco than it did. In both of those cases, confidential information regarding downward revisions of corporate earnings projections were disclosed to select individuals. Subsequent stock sales by these individuals or their "tippees" were held to violate the Exchange Act's proscriptions against fraudulent transactions. In both cases, however, the "tipped" information consisted of "hard" information regarding recent earnings, plus management's short range earnings forecasts for the current quarter in one case and the current year in another. Similarly, in each case the "tipped information" revealed a substantial departure from the trend indicated by prior public disclosures of management. Accordingly, while the forecasts involved some prediction, their reliability was not a factor of substantial significance, and the importance of the information to investors far outweighed any potential for misunderstanding.[75]

72. Talbert Dep., p. 6.

73. Talbert Dep., p. 13.

74. Docket # 177, at p. 6.

75. The other cases cited by Alaska are inapposite. In particular, in *Commonwealth Oil Refining Company, Inc. v. Tesoro Petroleum Corp.*, 394 F.Supp. 267 (S.D.N.Y.1975) and in *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2nd Cir. 1973), the information not disclosed was "hard" information—the amount of a possible tax loss in the one case and the amount of an already entered judgment in the other. These cases thus dealt with the significantly different issue of whether specifically quantifiable information relating to contingent events need be disclosed.

In this case, the record thus far developed fails to reveal that Energy received any information from Apco of a comparable character and, in the absence of any more specific showing, the Court concludes that it is appropriate to apply the "general rule" of the *Kohn* case. There is no case of which the Court is aware which would dictate a different result given the character of information received, the limited evidence concerning the purpose of its preparation, and the absence of any evidence that the information indicated a trend substantially different from that reflected in publicly available information on Apco.

2. *The DeGolyer And MacNaughton Report And The Rough Working Schedule.*

On August 21, 1974, Apco was presented by the DeGolyer & MacNaughton firm with an appraisal (hereafter the "D & M Report") of "proved and probable reserves and revenue from certain properties owned by Apco Oil Corporation as of April 1, 1974."[76] DeGolyer and MacNaughton had taken Apco's data on its oil and gas properties and had arrived at estimates of future net revenues for the Apco oil and gas reserves, with future net revenue defined as "estimated gross revenue from the producing properties less estimated operating expenses, *ad valorem* and severance taxes, and capital expenditures." [77] From the "future net revenues figures", DeGolyer and MacNaughton had then determined "present worth", that being "future net revenue discounted at the arbitrary rate of 11% per year compounded monthly over the expected period of realization." [78] The bottom line figure for the "present worth" valuation of Apco's oil and gas properties arrived at in the D & M Report was $64,517,100.[79] In the introductory materials to its report, DeGolyer & MacNaughton inserted the following caveat:

> Present worth as expressed herein should not be construed as fair market value since it does not include taxes on operating profits, allowance for return on investment, or usual business risks.[80]

This D & M Report was made available to Mr. McMillian, the Chairman of the Energy Board, by Mr. Millard, Chairman of Apco's Board. The giving of the report was on a "completely confidential basis" and was meant to facilitate inter-corporate "discussions" concerning a possible sale of Apco's oil and gas properties to Energy.[81]

Following the announcement of the first Alaska offer on July 7, 1975, certain unidentified members of the Apco accounting staff—acting at the direction of Apco's president, Mr. Siess—prepared what was later to become known as a "rough working schedule" of Apco liquidating values. According to Mr. Siess, this work was done in a hotel room by a few Apco staff members then in New York to provide a basis for discussion of the Alaska offer at an Apco Board meeting to be held on July 8, 1975. On this schedule, five "cases" were considered, each leading to a different "bottom line" per-share liquidation value of Apco stock. According to the footnotes contained at the bottom of the schedule, "Case I" utilized book values for *all* Apco assets; "Case II" did the same, except that Apco's interests in Argentina were completely (both as to assets and liabilities) written off the books. "Case III" took "Case II" as a basis, but changed the value of the Apco oil and gas properties from book value to that ascribed in the D & M Report (at the 11% discount rate basis), that

76. Exh. 15 to McMillian Dep., contained in Docket # 187.

77. *Id.* at 1.

78. *Id.* Actually, DeGolyer & MacNaughton had also included four other estimates of present worth, using discount rates of 8, 12, 15 and 20 percent. *Id.* at 10.

79. *Id.* at 10.

80. *Id.* at 1.

81. Millard Dep., Docket # 145, at 11–12.

value as discussed above, being $64,517,000.[82] "Case IV" took "Case III" and revised upwards from book value several other assets of Apco, the principal change in valuation being that of Apco's refining properties, listed on the books at $14,907,000 and valued in "Case IV" at $30,000,000. In the footnotes to "Case IV," "Case IV" is described as "Case III adjusted for asset liquidation value using management's best estimates." "Case V," unlike the other cases, did not consist of calculations of Apco's accounting staff at all, but rather was a recitation of the liquidation values assigned Apco's assets by an independent appraiser, John Herold.[83] The bottom line per-share liquidation values reached in the five cases were, respectively: $24.48, $18.50, $30.06, $36.22 and $31.50.

This "rough working schedule", like the D & M Report, was supplied to Energy by Apco on a confidential basis.[84] While it is not clear from the record precisely who at Apco passed this schedule to Energy and who at Energy received it, it is clear that the schedule was eventually passed by a representative of Energy to representatives of Arthur Anderson & Company.[85]

When the Special Committee of the Energy Board to Consider Tender Offers (hereafter "Special Committee") met on July 20, Mr. McMillian proposed to that body the amended tender offer now in controversy. The principal point of departure, other than the offering price, from Energy's prior offer was that the liquidation of Apco was now proposed as the followup to the acquisition of control. Mr. McMillian stated to the Special Committee that this course of action would:

(a) permit the company to acquire the oil and gas properties of Apco,

(b) avoid the common stock dilution which was inherent in the then outstanding tender offer, and

(c) based on the estimated value of Apco's assets, permit the company to make a profit on the liquidation.[86]

In order to substantiate these contentions, Mr. McMillian indicated that he "had had the accounting and finance departments of the Company, together with Arthur Anderson & Company, make projections as to the effect of the proposed transaction upon the financial position of the company."[87] The minutes of the meeting go on to state that "Mr. Stevens and Mr. Porter [Energy's in-house financial experts] then presented to the Committee an analysis which they had made of the effect of acquiring 1.5 million shares of Apco at $25 and then liquidating Apco, and a schedule showing various liquidating values of Apco. These documents, which were distributed to the members of the Committee, are attached to these minutes as Exhibit A and Exhibit B."[88]

Exhibit A, the record shows, was a document entitled "Case A" which sets forth the accounting implications for Energy of an acquisition and liquidation of Apco, based on assumed liquidating values for Apco assets. These assumed liquidation values were in turn lifted directly from the "Our" column of a three-column comparison of liquidating values of Apco capital and investment assets which constituted Exhibit B to the meeting minutes. The other two columns of Exhibit B to the meeting minutes were denominated "Their" (referring to Apco) and consisted of di-

82. On the books, as can be seen from the "Case I" figures, these properties are valued at $30,429,000.

83. Millard Dep., Docket # 145, at 34–5. Mr. Herold's oil industry appraisal service is evidently available to the public at a price. See Porter Dep., Docket # 148, at 34.

84. Millard Dep., Docket # 145, at 117.

85. Amman Dep., Docket # 145, at 42.

86. Minutes of July 20 Special Committee meeting, Exh. 57 to McMillian Dep., Docket # 137, at 3.

87. *Id.* at 4–5.

88. *Id.* at 5.

rect extracts from Cases III and IV of the "rough working schedule." Three footnotes were appended to Exhibit B as set before the Special Committee and these read as follows:

1) [Referenced to the "Their" column corresponding to Case III of the "rough working schedule"] Base Case I (May 31, 1975 balance sheet) less *Argentina* plus valuation of reserves as of 4–1–74.

2) [Referenced to the "Their" column corresponding to Case IV of the "rough working schedule"] Case III adjusted for asset liquidation value using management's best estimates.

3) [Not referenced] All other assets and liabilities will liquidate at book values.[89]

With respect to the two Apco assets to which the three columns ascribe the greatest estimated increase over book value—namely, the oil and gas properties and the refining properties, the three columns read as follows:

| | OUR | THEIR | |
|---|---|---|---|
| | | Case III | Case IV |
| Production | 55.0 [millions] | 64.5 | 64.5 |
| Refining | 30.0 | 14.9 | 30.0 |

The three bottom line figures for the liquidating values of the capital and investment assets of Apco presented in Exhibit B are as follows:

| | OUR | THEIR | |
|---|---|---|---|
| | | Case III | Case IV |
| TOTAL | 135.0 | 132.7 | 144.9 |

The 132.7 and 144.9 figures correspond to per share liquidation values on the rough working schedule of $30.06 and $36.22 per share, respectively.

Two days prior to the July 20th meeting, Mr. McMillian, in seeking $7.5 million additional credit from the First National City Bank for a second Energy tender, expressed the view that Apco would liquidate "in the range of $30, possibly going as high as $35." [90]

Energy filed its Amended Offer with the SEC on July 21, 1975. At that stage, the disclosure regarding the D & M Report and the "rough working schedule" read in its entirety as follows:

> The DeGolyer & MacNaughton Report referred to above shows that Apco's estimated net proven reserves at April 1, 1974 were 18,572,447 barrels of oil and condensate and 119,020,796 Mcf of natural gas (of which Energy understands 21,065,000 Mcf are of carbon dioxide). In addition, such report contained estimates of "present worth" of Apco's net proven oil and gas reserves which ranged from $74,732,000 at an 8 per cent discount rate to $44,645,000 at a 20% discount rate. "Present worth", as used in the Report, does not mean fair market value and excludes taxes on operating profits, allowance for return on investment and usual business risks.
>
> An internal schedule prepared by Apco, as of May 31, 1975, and furnished to Energy, estimated the following values per Share for Shares of Apco on the following bases: balance

89. Last page of Exh. 2 to Alaska Affirmative Brief, Docket # 123.

90. Dep. of McMillian, Docket # 137, at 402; Dep. of O'Connor, Docket # 136, at 61.

sheet value—$24.48; balance sheet value, excluding Argentina assets—$18.50; balance sheet value, excluding Argentina assets, plus valuation of proven reserves at April 1, 1974 as set forth in the report of DeGolyer & MacNaughton (at a discount rate of 11 per cent)—$30.06; balance sheet value, excluding Argentina assets plus valuation of proven reserves at April 1, 1974 as set forth in the report of DeGolyer & MacNaughton (at a discount rate of 11 per cent) adjusted for asset liquidation value using management's best estimate as to other assets—$36.22.

It is to be noted that no representation is here made that Energy has not utilized the rough working schedule in considering its offer.

Shortly after the filing, Apco advised Energy that Apco would not permit the Amended Offer to be mailed because Apco wanted the above-quoted paragraphs "to more clearly and accurately reflect Apco's position regarding the Schedule and the D & M Report and in order not to mislead the Apco stockholders." Accordingly, on July 22, 1975 counsel for the two companies met to discuss the matter and I think it a reasonable inference that Energy first learned of the full background of the "rough working schedule" at this time. The final product of this session, as it appeared in the amended tender, is set forth below:

> The DeGolyer & MacNaughton Report referred to above shows that Apco's estimated net proven reserves from certain properties in the United States and Canada at April 1, 1974 were 18,572,447 barrels of oil and condensate and 119,020,796 Mcf of natural gas (of which Energy understands 21,065,000 Mcf are of carbon dioxide). In addition, such report contained estimates of "present worth" of Apco's net proven oil and gas reserves which ranged from $74,732,000 at an 8% discount rate of $44,645,000 at a 20% discount rate. "Present Worth", as used in the Report, does not mean fair market value and excludes taxes on operating profits, allowance for return on investment and usual business risks. Energy has been advised by Apco that the "present worth" range set forth in such Report cannot be publicly disclosed by Apco under disclosure guidelines applicable to certain SEC filings and reports. Because such Report was made available by Apco to Energy, Energy believes that such disclosure is necessary and appropriate in connection with this Offer. Apco has further advised Energy that Apco believes that such estimates of "present worth" are not intended as estimates of the actual market value of Apco's net proven oil and gas reserves.
>
> A rough working schedule prepared by Apco's accounting department personnel as of May 31, 1975, for internal consideration reflecting book values of Apco's assets and various theoretical adjustments thereto based upon informal estimates by the preparer or upon various arbitrary assumptions has been furnished to Energy. This schedule reflects possible theoretical assigned "values" of shares of Apco of $18.50, $24.48 (book value per unaudited balance sheet at May 31, 1975), $30.06, $31.50 and $36.22. Apco has not approved public dissemination of this schedule and has informed Energy that this schedule does not represent the opinion of Apco's management or Board of Directors as to the value of Apco's shares in liquidation and should not be relied upon by any person but, to the contrary, that Apco's management and Board of Directors have not made any definitive estimate of such liquidation value. This schedule has not been relied upon by Energy in making this Offer, nor does it represent the opinion of Energy as to the liquidation value of the Apco shares. To the contrary, as pointed out above, there can be no assurance whether the value received by Apco shareholders upon liquidation

may be more or less than $25 per share.

While it is fair to say the record discloses that Apco's President feels liquidation would bring in excess of $25.00, it is clear that the $36.22 per share figure cannot, in any sense, accurately be described as "management's best estimate." I accept the proposition that Apco management had made no corporate judgment on liquidating value at the time of Energy's Amended Offer, and the record does not evidence any confidential communication from Apco's management to Energy on this subject other than the D & M Report and the "rough working schedule."

On these facts, Alaska argues that Energy should at least have revealed that its Board considered figures from the rough working schedule in deciding upon the offer and that, if it gave the range of figures from the rough working schedule at all, it should have revealed that Energy's management considered the high portion of the range a more reasonable assumption than the lower portion of the range. While I believe this argument poses a close question, under the unusual circumstances of this case, I cannot fault Energy's presentation.

First, I think it clear that, absent receipt of the Apco information, Energy would have had no duty to state its own judgment regarding the liquidation values of the Apco assets. Given the subjective judgment and assumptions which the record discloses are a necessary predicate for such an evaluation, I believe that the general rule of the *Kohn* case should control. At the same time, given receipt of the D & M Report and the rough working schedule from Apco, I can certainly understand the reluctance of Energy's counsel to omit any reference to those documents and cannot fault Energy for revealing their existence. The question, accordingly, becomes whether the presentation concerning them was materially misleading.

In analyzing that presentation it should be noted that while Energy represented that it did not rely upon the range reported in the working schedule in making its offer, it *did not,* in the Court's judgment, represent by implication that it had not considered the D & M Report, Apco's book values, or information that may have found its way into the working schedule. I believe a reasonable investor would have supposed, as the facts show, that Energy had formulated its own judgment on liquidation value, utilizing among other things, the oil and gas reserve figures from the D & M Report, and that, having made this judgment, it considered a tender price of $25.00 to be an economically feasible one from Energy's point of view. It is significant to note that while Energy's people based their estimate regarding the oil and gas properties on the D & M Report, they predicted a liquidation price of $55 million, as opposed to a $64.5 million value placed on those properties in the rough working schedule which was also based on the same report. In this context, I do not consider the Energy Board's exposure to Case III of the working papers to be of particular significance.

The Energy Board's exposure to Case IV of the rough working schedule is admittedly more troubling. At the time of the July 20th meeting, these figures were billed as Apco management's best estimates, and it is likely that the Energy Board did consider these figures—at least as support for the reliability of the Energy assessment of such a major item as the refining properties. As will be recalled, the value independently arrived at for the "Our" column and the value in Case IV of the "Their" column were both $30.0 million, as opposed to a book value of $14.9 million.

If Case IV in fact represented Apco management's best estimate of liquidation value and Energy had relied upon it to this degree, a further disclosure would clearly have been appropriate.

But prior to the issuance of the offer, Energy was advised that Case IV did not represent a determination of Apco's management with respect to liquidation values. One can imagine the problem which this posed for Energy's counsel. The resolution of the problem was a statement of the range reported in the rough working schedule and a warning that neither Apco nor Energy thought the range should be relied upon. The presentation concluded with the cautionary statement, which the Court concludes to be accurate, that "there can be no assurance" that the liquidation value will be "more or less than $25 per share."

I have given much thought to what else or different might have been said and, in particular, whether the statement should have included a recitation with respect to Energy's use of Case IV from the rough working schedule. Given the facts at the time of the issuance of the offer, however, I have not arrived at any alternative statement which, I believe, as a practical matter, would not have increased the likelihood of confusion and undue reliance on the rough working schedule's range of figures. In short, I read the final version of the tender materials as a good faith effort to disclose what had been received and, at the same time, to guard against stockholders being misled. I conclude that the approach of "we received these figures from Apco but neither of us think they should be relied upon," was the best that could reasonably be expected under the circumstances.

B. *The Alleged Failure To Disclose Joint Venture Agreement Obstacles To Energy's Objectives.*

The "Purpose" section of Energy's offer states:

> In the event that Energy acquires working control of Apco, Energy does not presently intend to merge or otherwise combine Apco with Energy. Energy's present intention is to cause Apco to adopt a plan of complete liquidation pursuant to which Apco will, during the course of the year following the adoption of such plan, sell or otherwise dispose of its assets (for cash or securities of other entities) and distribute the proceeds, either cash or securities, after payment, or provision for payment, of Apco's debts (including Apco's oustanding debentures), to the Apco stockholders. The ultimate disposition, in connection with the liquidation, of the stock of Energy held by Apco has not yet been determined. The adoption of such a plan must be approved by the holders of 51% of Apco's then outstanding Common Stock. The value received by Apco stockholders upon liquidation may be more or less than $25 per share. Energy reserves the right to purchase, for cash or securities, substantially all of Apco's oil and gas properties (except those in Argentina) at the fair market value thereof as determined by an independent petroleum engineer satisfactory to both Energy and Apco.

Alaska maintains that Energy's offer was materially misleading because it failed to reveal that the Joint Venture Agreement posed an insurmountable barrier to the accomplishment of this portion of Energy's objectives. Alaska points out, in an argument similar to that advanced by Energy and accepted by the Court above, that the feasibility of accomplishing the liquidation plan is a material matter which is likely to affect an Apco stockholder's decision in responding to the competing tenders.

Alaska asserts three deficiencies in this area; only one merits extended discussion.[91] Section B of the Joint

91. The other two do not. While Alaska argues that Energy fails to disclose that Alaska has a right of proportional representation on Energy's Board and, indeed, expresses the erroneous opinion that it does not, as earlier indicated, the Court believes that this is a debatable proposition and the Energy offer reveals the respective positions of the parties on it. This is sufficient. Second, Alaska argues that Energy failed to

Venture Agreement provides in part as follows:

> [I]n order to provide for continuity of management and policies of New Company, the parties agree:
>
> 1. In the event that Tipperary, Apco, Gulf or Alaska desire *to sell, transfer or otherwise dispose of all or any portion of its interest in this joint venture or stock in the New Company* (or its interest in the properties divested by El Paso), *said party (hereinafter referred to as the Transferor) in every instance shall first offer in writing such interest or stock in New Company to the remaining parties to this Agreement* who shall then have the right, exercisable within 60 days, to purchase such interest or stock in the same proportions that their interests or stock holdings in New Company bear to each other at the date of the written notice.
>
> * * * * * *
>
> 3. If any one or more of the remaining parties to this Agreement shall fail to purchase the interest or stock offered to it by Transferor . . ., the other parties to this Agreement desiring to purchase such interest or stock shall then have 30 days within which to purchase such interest or stock in the proportions as their respective interests or stock holdings bear to each other. (Emphasis added.)

Since liquidation of Apco would necessarily involve a sale, transfer or other disposition of Apco's Energy stock, if New Company is construed to refer to Energy at the present time, these provisions would appear on their face to give Alaska the right to purchase at least 60%, and possibly all, of that stock prior to the completion of the liquidation.[92] Energy does not dispute this proposition; nor does it dispute that its offer makes no specific disclosure regarding Section D and a possible right of first refusal in the hands of members of the Apco Group. Rather, Energy argues that (1) the right of first refusal applied only to the stock of Northwest Pipeline and does not apply to Energy stock, (2) in any event, the right of first refusal poses no impediment to its liquidation objective, and (3) the tender offer did tell stockholders that "Alaska may be able to secure control of Energy even if Energy succeeds in acquiring control of Apco."

Energy's first argument need not detain us long. Energy was aware, prior to its offer, that Alaska asserted a right of first refusal with respect to Energy's stock and that this claim was clearly one of substance. Indeed, *Energy itself*, both in this Court and before the Court in Colorado, has expressly argued that the sections following Section A of the Joint Venture Agreement are currently applicable to Energy shares. In its counterclaim, filed in this Court one day after the issuance of its amended offer and obviously prepared before that time, Energy asserted that the Alaska offer should be enjoined because it failed to disclose that accomplishment of Alaska's purpose would violate Section D of the Joint Venture Agreement.[93] Moreover,

disclose that Section D of the Joint Venture Agreement requires Alaska's consent to Energy's alleged plan to purchase the oil and gas producing properties of Apco in the course of the liquidation. The Court believes that Alaska has little likelihood of success on this argument. Section D is designed to require consent in the event of proposed combinations between Energy and a member of the Apco group. It is in this context that it mentions a sale of assets by an Apco Group member to New Company. This reference seems clearly to be directed to a sale of all or substantially all of the parties' assets which will effect a combination of the two companies. A sale of the oil and gas properties of Apco to Energy, on this record, would not appear to fall within Section D.

92. The Court does not so hold. These are arguments which can be made to the contrary and it is sufficient for present purposes to hold that Alaska can and does make a substantial claim to such a right.

93. The argument had as a predicate that the Joint Venture Agreement survived the reorganization and that the reference to "New Company" now means Energy.

in a memorandum recently filed with the Colorado Court, Energy stated:

> Section A of the September, 1971 agreement is directed exclusively to actions to be taken by the Apco Group in its efforts to become the successful applicant in the divestiture proceeding and in establishing the "New Company."
>
> * * * * * *
>
> The succeeding Sections of the agreement, which set forth various provisions with respect to disposition of the stock of Energy by any member of the Apco Group, are not, however, so limited in their duration—rather, they explicitly run for ten years.

Energy's argument that the right of first refusal is not inconsistent with liquidation and, therefore, is of no interest to Apco stockholders has merit only if one is willing to ignore the factual context in which Energy's amended offer was made. The tender materials indicate that liquidation is "Energy's sole purpose for Apco, that "the transactions discussed" are subject to "successful completion of this Offer, the drafting of a definitive plan of complete liquidation and" director and stockholder approval, etc., and that the liquidation plan will be consummated within a year of its adoption. It clearly conveys the impression that liquidation will not be delayed and that the holders of Apco stock will receive the liquidation value of Apco within a year after the formalities have been taken care of. The situation at the time of Energy's offer, however, held the potential for substantial litigation over the right of first refusal. In response to a question at oral argument, Energy's counsel stated that, if the right is asserted, Energy may well choose merely to offer Apco's Energy stock to Alaska and proceed with the liquidation, and this is, of course, conceivable. On the present record, however, it seems highly unlikely that Energy's management presently intends to voluntarily surrender Apco's Energy stock to Alaska. If, as I believe, it does not,[94] I think the stockholders of Apco should have been told of Alaska's claim to a right of first refusal and of the likelihood of litigation to resolve the matter prior to consummation of the plan of complete liquidation. The mere recitation, in the context of a description of this litigation, that Alaska claims it may secure control of Energy even if the Energy offer succeeds, does not serve to cure the deficiency.

C. *Energy And Apco's "Public Relations" Campaign.*

Alaska charges that Apco and Energy have conducted a misleading media campaign consisting, *inter alia*, of defamation of Alaska's credit and misrepresentations about the import of some of the legal proceedings associated with this tender offer fight. A series of letters and press releases are cited in support of this charge. I conclude that the reliance on Energy's letter of July 11, 1975, Apco's letter of July 13, 1975, and the Energy press release of July 24, 1975 is misplaced.[95] The other documents referred to will be discussed in turn.

94. Among other things, Energy's present contention that the right of first refusal does not apply to Energy stock seems to suggest that its management is not ready to concede the existence of a right of first refusal.

95. The July 11th letter to Governors and public utility commissioners is not alleged to have contained any misstatements of fact. Moreover, the letter was not directed at investors and is thus not the type of material required to be filed with the SEC. See 17 C.F.R. §§ 240.14d-1(e), 13d-101, item 8 (1975). Alaska's objection to the July 13, 1975 letter relates to its non-disclosure of the Apco "forecasts" and thus what was said in Section A, *supra*, is dispositive. Energy's press release of July 24th does not say that the vote of the Special Committee was unanimous and the Court considers McMillian's statement to the Court indicating that it was unanimous to be a good faith mistake.

1. *Energy's July 25th Press Release.*

On July 25, 1975, Energy issued a press release[96] entitled:

*Northwest Asks SEC To Investigate Financing Of Alaska's Tender Offer*

In pertinent part, that release read as follows:

> John G. McMillian, Chairman and Chief Executive Officer of Northwest Energy Company, Salt Lake City, Utah, said today the Company has filed a memorandum with the Securities and Exchange Commission, Washington, D. C. as to the financing of Alaska Interstate Company's bid to gain control of Apco Oil Corporation and, subsequently, Northwest Energy.
>
> McMillian said the memorandum advised the SEC of the facts and circumstances of which they have knowledge surrounding a $30 million loan agreement between Chemical Bank, New York, and Alaska Interstate *which was arranged through the aid of Kuhn, Loeb & Co.*, New York investment bankers.
>
> A suit filed by Apco on July 23, 1975 in the U. S. District Court, Southern District of New York, charges Alaska Interstate, Chemical Bank and Kuhn, Loeb with violations of Regulations U, X and T issued by the Federal Reserve Board under the Securities Exchange Act. The regulations govern the lending, borrowing and arranging of loans on margin, he said.
>
> * * * * * *
>
> He also stated that Alaska Interstate, during the period 1970–1974, showed a compound annual rate of decline of 2.65 per cent, and, *based upon its indicated cash flow, Alaska by itself could not possibly support the debt service on the $30 million loan without substantially jeopardizing its existing operation.*
>
> "We can only assume that if Alaska is successful in its takeover attempt," McMillian said, "it intends to use funds derived from Apco and Northwest to carry its debt. In gamblers' parlance this is known as 'betting on the come', and I am surprised that Chemical Bank would be a party to such a venture." (emphasis supplied)

Alaska finds fault with this press release in a number of respects.

This Court today has held that the facts currently known to Energy do not indicate that the tender loan to Alaska was "arranged" by Kuhn, Loeb in violation of Regulation T. Although the Court does not consider Energy's argument in this case with respect to Regulation T to have been frivolous, I conclude that, given the circumstances at the time of its issuance, Energy's July 25th statement on the subject went too far and was materially misleading.

In its press release, Energy does not merely state an opinion that there had been a violation of Regulation T or that a lawsuit had been filed challenging Alaska's tender on that ground. While it reports that such a lawsuit has been filed, it also states, in the context of Regulation T and without qualification, that the tender loan was "arranged through Kuhn, Loeb." The message conveyed was that Energy knows facts which demonstrate that the loan violated Regulation T. The potential impact of this information of Apco stockholders is obvious. It tells them they have only one viable alternative if they wish to tender. Accordingly, I find that Alaska's first attack on this press release has merit.

Secondly, Alaska argues that the assertions that it suffered a 2.65% rate of decline during the last five fiscal years and that it cannot possibly self-service its debt to Chemical Bank without jeopardizing its existing operation are false. The Court can find no fault with Energy's characterization of Alaska's earnings record;[97] however, on the current

96. Exh. 3 to Aff. of Stuart L. Shapiro, Docket # 124.

97. Alaska's expert does not quarrel with Energy's expert's calculations. Rather, he

record, it does find the assertion about Alaska's repayment of its debt to be objectionable.

As was implicit in the Court's discussion in Section II B, *supra,* it will be a rare case where reasonable men cannot differ about the cash flow prospects of a given company over a five year period. Had Energy's press release thus said that it was Energy's opinion, based upon the information available to it, that Alaska would not be able to self-service its debt to Chemical, this would be a different case. What Energy said, however, is: "based on its indicated cash flow [the nature and source of which projections are undisclosed] . . . Alaska *could not possibly*" self-service the debt without dire consequences. The Court reads this as, in effect, an assertion that Alaska is in such bad straits that this is one of those rare cases where no reasonable financial expert, using any generally accepted method of projection, could possibly predict cash flow for Alaska sufficient to cover the debt service on its loan with Chemical.

The record put forward by Energy fails to show that it had a reasonable basis for making this assertion. Energy's attack on Alaska's capability to service its debt is based on Mr. Lubanko's assertion that there is "no reasonable basis to conclude that Alaska can service $30 million of additional debt from the operating results of Alaska." Mr. Lubanko, however, does not set forth any estimate of Alaska's future earnings of his own, much less one on which all reasonable experts would agree. Rather, Mr. Lubanko contents himself with criticizing Alaska's projection on a number of grounds. Alaska's experts, on the other hand, argue with equal vigor (noting, in particular, that Alaska has, to date, somewhat exceeded its 1974 projections) that Alaska's projections are reasonable. It follows from what has been said in Section II B, *supra,* that there is ample room for reasonable disagreement over the matter. That being true, Energy's "proof" falls short of its assertion.

In the last analysis, as Mr. Lubanko's affidavit concedes, Energy's assertion, though not represented as such, is only an opinion—a strongly held opinion, perhaps—but an opinion nonetheless. Thus, Energy's press release says too much in an area of material importance to Apco stockholders.

2. *Energy's Press Release Regarding The Third Circuit Stay.*

Alaska maintains that a press release issued by Energy early in August materially misrepresented the effect of proceedings in this Court and the Third Circuit Court of Appeals and was deliberately designed to unfairly discourage withdrawals of Apco shares previously tendered to Energy. A recitation of the background necessary to understand the arguments of the parties on this point would lengthen an opinion which, as I think all will concede, is already too lengthy.

It will suffice for present purposes to record two things. First, while it would have been preferable if Energy had prefaced the challenged statement with an indication that it represented Alaska's contention with respect to the effect of previous proceedings in the case, I do not think the press release evidences bad faith. I note that it does reflect the fact that the "pro rata" versus "first-come, first-served" issue remained "pending before the Third Circuit and [had] . . . not been finally resolved."

Second, while the matter is not free from doubt, the Court remains convinced that its Order of August 1, 1975 was appropriate for the reasons stated in open

argues that Energy should have used as the basis for its calculations Alaska's earnings from "Continuing Operations" rather than the figures for net income from all operations which Energy did in fact use. Given that the figures that Energy used were taken from a financial analysis of Alaska prepared by Kuhn, Loeb and that it certainly is not unreasonable to judge the capability of management by its actual total performance, I think the past earning reference constitutes fair comment.

court and recorded on that day.[98] That Order recorded what the Court had perceived as an agreement of the parties that each would buy on a pro-rata basis all shares tendered to it prior to expiration dates to be set by the Court. The Court believes that the purchase of such shares on a "first-come, first-served" basis would be inconsistent with that agreement and that Energy should hereafter receive no advantage by reason of shares which were tendered or not withdrawn because of a contrary representation.

D. *The Alleged Failure Of Disclosure With Respect To Energy's Tender Offer Financing.*

Energy's tender offer materials contain the following disclosure regarding Energy's financial arrangements with respect to the purchase price of tendered Apco shares:

> The approximately $37,500,000 required by Energy to purchase 1,500,000 Shares under this Offer (excluding fees, commissions and expenses which will be paid from the general funds of Energy) will be borrowed by Energy from First National City Bank under a loan agreement to be entered into pursuant to a written commitment from such bank. A commitment fee of 1% of the commitment has been paid by Energy. *The loan* will be available through September 30, 1975 and will bear interest, payable monthly at a rate of 1% per annum above 120% of the base rate of the bank, and *will mature on December 31, 1975. Energy has agreed, as security for the loan,* to pledge all of the outstanding shares of stock of its wholly-owned subsidiary, Northwest Pipeline Corporation, *all of the outstanding shares of Apco acquired pursuant to this Offer,* and all of the outstanding shares of its wholly-owned subsidiary, Northwest Coal Corporation. Under the terms of the commitment, Energy will not be entitled to incur any other indebtedness for borrowed money or for the deferred purchase price of property and will agree not to permit Pipeline to agree to restrict the payment of its dividends in any manner more restrictive than restrictions presently existing. The loan agreement will also contain representations, warranties, covenants and events of default which are customary to such transactions. Energy does not have commitments for borrowings of amounts significantly in excess of those required for the purchase of 1,500,000 Shares and anticipates that additional borrowing would be required if significantly more Shares were to be purchased.[99]

Alaska argues that this disclosure is inadequate because it fails to reveal that Energy intends to refinance its loan and to repay Citibank out of the proceeds of the liquidation of Apco. This fact is material, Alaska argues, because there is a substantial chance that Energy may not be able to accomplish its planned liquidation of Apco and, therefore, there is a substantial chance—because of the Pledge Agreement—that "Energy may have to surrender control of Apco to [Citibank]".[100] This argument is without merit.

To begin with, the SEC rules on the subject of disclosure regarding the financing of tender offer bids require only that the offeror:

> State the source and amount of funds or other consideration used or to be used in making the purchases, and if any part of the purchase price or proposed purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading the securities, a description of the transaction and the names of parties thereto.[101]

98. Docket ## 107 and 92.

99. Emphasis supplied.

100. Alaska Affirmative Brief, Docket # 123, at 65.

101. 17 C.F.R. § 240.14d-1(13d-101).

As can be seen from the text of Energy's disclosure, cited *supra*, Energy has fully met these requirements whose purpose—in a cash tender offer situation—would appear to be the provision of the tender offeree with information about the prospects of his being paid off in full and on schedule, should he decide to tender.

The record does reflect that Energy recognized that it would be required to refinance the tender loan prior to its expiration date and that several possibilities were being discussed. It does not reflect that any plan for such refinancing, either in terms of amount or otherwise, had been decided upon or that there is any reason to believe the refinancing will be unfeasible or difficult for Energy. Nor does the record indicate that the Apco liquidation was being counted upon to pay off the Citibank tender loan on the date of its present maturity. While the evidence does indicate that Citibank and Energy considered the fact that Energy's share of the proceeds of an Apco liquidation would ultimately be available to Energy to meet its obligations, this fact was apparent from the tender materials and, in any event, it is difficult to see what interest Apco shareholders would have in what Energy does with its share of the proceeds of a liquidation. On this record, I find no deficiency in Energy's disclosure regarding its financing.

E. *Alleged Unlawful Proxy Solicitation Of the Loeb, Rhoades Group.*

On July 22, 1975, John L. Loeb wrote to Mr. McMillian in his capacity as Chairman of the Board and President of Energy, as follows:

> This will advise you that it is the present intention of partners of Loeb, Rhoades & Co., members of their families, charitable foundations created by certain of such persons and trusts in which certain of such persons are either trustees or have a beneficial interest, not to tender the shares of Apco Oil Corporation beneficially owned by them (approximately 250,000 shares) either to Northwest Energy Company or to Alaska Interstate Company under their outstanding tender offers and that they intend to retain such shares pending the liquidation of Apco Oil Corporation.
>
> This will also advise you that as shareholders of Apco, such persons welcome the offer to Northwest Energy Company announced today to acquire shares of Apco and, in the event of the successful completion of your tender offer, intend, under present circumstances, to vote their Apco shares for the liquidation of Apco to the equal benefit of all stockholders and for the election of a Board of Directors of Apco, a majority of which support the efficient and orderly liquidation of Apco under the leadership of Northwest.[102]

This letter from Loeb to Energy was written at Energy's request[103] specifically in response to requests by Mr. Lubanko of F. Eberstadt & Co. and Mr. Daum, a director of Energy, that the Loeb, Rhoades Group indicate its intentions with regard to the outstanding tender offers and the plans of Energy to liquidate Apco.[104]

Alaska charges that these requests for expressions of intent constitute proxy solicitations, unlawful for having been made without compliance with certain disclosure requirements of the Exchange Act proxy rules. Energy concedes lack of compliance with the disclosure requirements but disagrees that the Lubanko and Daum inquiries amount to proxy solicitations as defined in pertinent regulations. The Court agrees with Energy.

102. Letter of Loeb to McMillian, Annex T to Energy's Opposition Brief, Docket # 187. The substance of Loeb's letter is disclosed in Energy's tender offer at # 15, p. 10.

103. See Schedule 13D filed by Loeb, Rhoades Group, Exh. 6 to Millard Dep., Docket # 145, at 7.

104. Lubanko Dep., Docket # 133, at pp. 85–6; Daum Dep., Docket # 138, at 240–41.

Rule 14(a)–1(f)(2) under the Securities Exchange Act states that the terms "solicit" and "solicitation" include: (1) any request for a proxy whether or not accompanied by, or included in, a form of proxy; (2) any request to execute or not to execute, or to revoke, a proxy; or (3) the furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy . . . 17 C.F.R. § 240.14(a)–1(f)(2). On the current record, provisions 1 and 2 are clearly inapplicable. Whether the Lubanko and Daum "*communications*" can be said to have been reasonably calculated to result in the procurement, withholding or revocation of a proxy scarcely merits more discussion. This record indicates that the communications were restricted to inquiries and did not contain any material designed or reasonably calculated to persuade.[105] Moreover, a letter of intent of this kind scarcely amounts to an authorization of a designee to vote shares. No shareholder meeting is in the immediate offing and the eventual presentation to the shareholders of the liquidation issues is, to say the least, a contingent matter.[106]

## IV. THE HONIG REMOVAL ISSUE.

Section 141(k) of the Delaware Corporation Law, as amended in 1974,[107] with certain exceptions not here relevant, provides that stockholders may remove a director at any time with or without cause. Section 228 of that statute [108] permits such removal without a stockholders' meeting by written consent of stockholders having not less than the minimum number of votes that would be necessary to take such action at a meeting at which all shares entitled to vote thereon were present and voted.

The Voting Trust Agreement, it will be recalled, directs that the Voting Trustee vote the trusteed shares in accordance with the direction of Energy's Board. Relying on these provisions of Delaware law and the Voting Trust, the Energy Board passed a resolution on July 8, 1975 directing the Voting Trustee to sign a written consent removing Mr. Honig as a director of Energy. The motivation behind the resolution, to the extent it is reflected in the current record, was apparently a feeling on the part of the other Board members that the Chief Executive Officer of Alaska, who was seeking control of Energy in a tender offer, had a conflict of interest and should not sit on Energy's Board.

The Voting Trustee has indicated a willingness to follow this directive and Alaska and Mr. Honig asks this Court to prevent the implementation of the July 8th resolution.

It is important to remember that this is not a typical situation involving stockholder removal of a director without cause.[109] Here, the stockholder vote for removal was directed by Energy's Board, and, while this does not make the contemplated removal the equivalent of a removal by directors, both sides seem to agree that the Energy Board had a fiduciary duty in connection with its exercise of power under the Voting Trust Agreement. *Cf. Smith v. Biggs Boiler Works Co.*, 33 Del.Ch. 183, 91 A.2d 193 (1952).

105. *Sargent v. Genesco's Inc.*, 492 F.2d 750 (5th Cir. 1974), relied on by Alaska, merely held that dismissal for failure to state a claim was inappropriate where an objected-to letter of management might, upon further development of the record, be shown to have been more than merely informational. 495 F.2d at 767–68.

106. As Energy correctly points out, the letter to shareholders found to constitute a proxy solicitation in *SEC v. Okin*, 132 F.2d 784 (2nd Cir. 1943) was distributed subsequent to management's mailing of its formal proxy solicitation material, i. e., in close proximity to the shareholders' meeting at which the vote would be taken. 132 F.2d at 786.

107. 8 Del.C. § 141(k).

108. 8 Del.C. § 228.

109. In such a case, the Delaware statute does not appear to contemplate judicial review other than with respect to procedural matters.

Under these circumstances, I agree with Alaska that Mr. Honig could not be removed by the other members of the Energy Board *solely* because Alaska was seeking control of Energy. As then Chancellor Seitz observed in *Campbell v. Loew's, Inc.*, 36 Del.Ch. 563, 134 A.2d 852, 860 (1957):

> I am satisfied that a charge that the directors [whose removal is sought] desired to take over control of the corporation is not a reason for their ouster. *Standing alone*, it is a perfectly legitimate objective which is a part of the very fabric of corporate existence. (emphasis supplied)

The fact that the other members of the Board of Energy could not remove Mr. Honig solely to protect their own positions, however, does not by itself win Alaska's and Mr. Honig's case on the point. The record is clear that Energy's Board resists Alaska's effort to control; it does not, as far as I have been able to determine, fully develop the reasons for that opposition. There are suggestions in the record that the Energy Board's position on the Alaska tender and the Honig removal rest on good faith views that control by Alaska would bring about undesirable changes in Energy to the detriment of its stockholders[110] and that Mr. Honig's presence on the Board during the fight for control would seriously jeopardize Energy's efforts to stave off such control.[111] This would pose a different question, one to which the parties have not directly addressed themselves in the briefing.[112]

Accordingly, I express no view on the question that would be so presented. I mention it only to suggest that Alaska and Mr. Honig's right to bar removal is not as clear as they suggest and that there may be a potential of some harm to Energy should this Court choose to intervene.

I rest my holding that preliminary relief is inappropriate on a finding that Alaska and Mr. Honig have not shown that irreparable harm will occur to them from Mr. Honig's removal between now and the time the Court can deal fully with the issue on its merits. As a practical matter, given the current situation on the Energy Board, I consider it unlikely, to say the least, that Mr. Honig's presence would materially influence the formulation of corporate policy for Energy during that period. The motion for preliminary relief against the removal will be denied.

## V. SUMMARY.

Thus, the Court has concluded that both tender offers are materially deficient in failing to fully disclose obstacles to the attainment of their ultimate objectives. In addition, the Court has concluded that Energy's press campaign has, in several respects, gone beyond the bounds of fair comment. The Court will confer with counsel promptly regarding the appropriate form of relief.

The parties will not, without prior Court approval, communicate the existence or content of this Opinion to anyone until a final decision is reached on the form of relief, and this Opinion will not be made a part of the public record of the case until that time.

110. As indicated above, the record suggests that this fight for control may involve substantial issues regarding corporate policy.

111. Compare the Delaware cases permitting expenditure of corporate funds for proxy solicitation over "policy" issues, collected in *Steinberg v. Adams*, 90 F.Supp. 604 (S.D.N.Y.1950).

112. Compare *Henshaw v. American Cement Corporation*, 252 A.2d 125 (Del.Ch.1969) (a director cannot be denied access to corporate information even though he may be hostile to management, but the corporation has a right to be protected against director communication of such information to others having interests in conflict with those of the corporation).